STATE OF VERMONT
SUPERIOR COURT – ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| In re Regan Subdivision Permit | { { { | Docket No. 188-9-09 Vtec |

## Decision on Cross Motions for Summary Judgment

Currently before the Court are the parties' cross motions for summary judgment. This appeal was from the City of Burlington ("City") Development Review Board ("DRB") approval of Applicant Ute Regan's ("Applicant") proposed subdivision, dividing her 0.41 acre parcel on Chittenden Drive in Burlington into two parcels. Appellants DeForest Realty ("DeForest") and Friends of Chittenden Drive ("Friends") (collectively "Appellants") appealed the decision, asking this Court to consider whether the subdivision meets applicable standards and criteria in the City of Burlington Comprehensive Development Ordinance ("CDO").[1]

## Factual Background

For the sole purpose of putting the pending motions into context, the Court recites the following facts, all of which we understand to be undisputed unless otherwise noted:

1.      Applicant owns a parcel of land, originally identified as Parcel 76 when the lot was first created, located on Chittenden Drive in Burlington. The property is improved with a residential house and is currently identified as 46 Chittenden Drive. Applicant's property is hereinafter referred to as the Property.

2.      The Property comprises 17,656 square feet, or about 0.41 of an acre and has 147 feet of frontage along Chittenden Drive.

3.      The Property was originally created in 1955 as one of several lots that were part of an approved subdivision then known as the Overlake Park Development.

---

[1]  Appellant DeForest and Applicant initially challenged the propriety of a condition that the DRB imposed requiring Applicant to prove that the new lot would have legal access across a 10 foot wide green strip separating it from the paved roadway portion of Chittenden Drive. Since the filing of this appeal, the Civil Division of the Vermont Superior Court rendered a determination regarding the legal merit of Applicant's access across the green strip. See Regan v. Pomerleau, No. S0239-11 CnCv (Vt. Super. Ct. Civ. Div. Oct 27, 2011) (Crawford, J.). This legal issue and the propriety of an approval condition like that imposed by the DRB is the subject of DeForest's Question 4 and Applicant's Question 1. Since the parties do not address these issues in their cross motions for summary judgment, we do not address them in this pre-trial decision.

4.     By warranty deed in 1961, Overlake Park Development Corporation conveyed the subdivided property, along with "all that land that was laid out as public streets on [a certain site] map" to Appellant DeForest Realty, Inc.

5.     The City has performed some maintenance-related tasks on Chittenden Drive to provide a base measure of protection for the general public, including snow plowing and maintenance on water and sewer lines.

6.     The paved road surface of Chittenden Drive is about 30 feet wide.

7.     Several other residential properties are located on Chittenden Drive, including some that adjoin Applicant's property.

8.     On its western end, Chittenden Drive connects to South Willard Street, a public road that is also known as Vermont Route 7.

9.     On September 1, 2009, the DRB approved Applicant's proposed subdivision of her lot into two lots: one being an 11,326 square foot lot with 87 feet of frontage on Chittenden Drive and another being a 6,330 square foot lot with 60 feet of frontage on Chittenden Drive. The first of these proposed lots contains the existing single family residence,[2] while the second would be a vacant lot. To assist the reader, we have attached to this Decision a copy of Applicant's site map, filed as Exhibit 3 to Applicant's summary judgment motion; Applicant's proposed undeveloped lot is identified on this site map as "Lot 1," and the developed lot is identified as "Lot 2."

10.     Applicant's Property is located in a Residential Low Density Zoning District ("the RL District"), as defined by the CDO.

11.     The version of the CDO that applies to Applicant's 2009 application became effective on January 30, 2008.

## Discussion

We begin our analysis by restating the procedural standard for considering pre-trial requests for summary judgment, which may only be granted to a moving party if she shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); V.R.E.C.P. 5(a)(2). We must "accept as true the [factual] allegations made in opposition to the motion for summary judgment" and give the non-moving

---

[2] In a coordinated case, we have already issued a decision regarding Applicant's application for an accessory dwelling permit within this single family residence. See Regan Accessory Use Permit Application, No. 117-7-12 Vtec (Vt. Envtl. Ct. Dec. 14, 2012) (Durkin, J.).

2

party the benefit of all reasonable doubts and inferences. <u>Robertson v. Mylan Labs., Inc.</u>, 2004 VT 15, ¶ 15, 176 Vt. 356; see also V.R.C.P. 56(c). When considering cross-motions for summary judgment, we look at each motion individually and give the party opposing a motion the benefit of all reasonable doubts and inferences. <u>City of Burlington v. Fairpoint Communications</u>, 2009 VT 59, ¶ 5, 186 Vt. 332 (citing <u>Toys, Inc. v. F.M. Burlington Co.</u>, 155 Vt. 44, 48 (1990)). Nonetheless, both the party claiming that a material fact is undisputed and the party seeking to establish a dispute of material fact must support their assertions with citations to admissible evidence. V.R.C.P. 56(c)(1). See Reporter's Notes—2012 Amendment, V.R.C.P. 56 ("Rules 56(c)(1)(B) and (c)(2) clarify that all asserted facts must be based on admissible evidence"). The Environmental Division follows the Vermont Rules of Evidence, except that we may admit evidence otherwise inadmissible under those Rules, "if [the proffered evidence] is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." V.R.E.C.P. 5(e)(1).

Applicant has moved for summary judgment on whether her subdivision proposal conforms to CDO §§ 5.2.2, 4.4.5, 3.2.2, 6.0.1, and 6.1.2. These inquiries encompass all of the legal questions raised in this appeal, although the legal issues are raised in each party's Statements of Questions in differently-numbered paragraphs. We address each legal issue in turn.

## I.     CDO  § 5.2.2 (required frontage on a public road or public waters)

Appellants ask whether the proposed subdivision will violate CDO § 5.2.2, which forbids land development on "lots that do not have frontage on a public road or public waters," with one exception: "[f]or lots of record existing as of January 1, 2007, development may be permitted with approval of the DRB, if access to such road or public waters exists by a permanent easement or right-of-way of at least twenty-five (25) feet in width." The applicable enabling statute directs that:

> Land development may be permitted on lots that do not have frontage either on a public road or public waters, provided that access through a permanent easement or right-of-way has been approved in accordance with standards and process specified in the bylaws. This approval shall be pursuant to subdivision bylaws adopted in accordance with section 4418 of this title, or where subdivision bylaws have not been adopted or do not apply, through a process and pursuant to standards defined in bylaws adopted for the purpose of assuring safe and adequate access. Any permanent easement or right-of-way providing access to such a road or waters shall be at least 20 feet in width.

24 V.S.A. §4412(3).

Applicant first argues that Chittenden Drive is a public road and thus her proposal complies with CDO § 5.2.2 without having to reach the exception. In the alternative, Applicant argues that even if Chittenden Drive is a private road, her proposal meets the exception because her Property—as it currently exists and after future subdivision—has a permanent easement to access and use Chittenden Drive,[3] which is over 25 feet wide and connects to a public road: Route 7; she maintains that the enabling statute prevents the City from treating lots created before January 1, 2007 differently than later-created lots. Appellants counter that Chittenden Drive is not a public road under Vermont Supreme Court precedent in Okemo Mountain, Inc. v. Town of Ludlow Zoning Bd. of Adjustment, 164 Vt. 447 (1995), and that the exception included in CDO § 5.2.2 cannot benefit Applicant and her proposed subdivision because the City validly requires all lots created after January 1, 2007 to have frontage on a public road, and Applicant proposed her subdivision after that date.

When interpreting a municipal bylaw, courts must give effect to the intent of the relevant legislative body. See Town of Killington v. State, 172 Vt. 182, 188 (2001); In re Vt. Nat'l Bank, 157 Vt. 306, 312 (1991). Since land use regulation is in derogation of the common law, if the plain language of an ordinance is unclear, we generally resolve any ambiguity in favor of the landowner. In re Miserocchi, 170 Vt. 320, 324 (2000). However, we may not interpret an ordinance inconsistently with its enabling statute. Lemieux v. Tri-State Lotto Comm'n, 164 Vt. 110, 116-17 (1995).

As a so-called Dillon's Rule state, Vermont municipalities possess only those powers and functions that the state legislature affirmatively authorizes them to possess through enabling statutes, as well as additional functions incident, subordinate, or necessary to their exercise. See Gade v. Chittenden Solid Waste Dist., 2009 VT 107, ¶ 13, 187 Vt. 7; Hinesburg Sand & Gravel Co. v. Town of Hinesburg, 135 Vt. 484, 486 (1977). As John Forrest Dillon, for whom that principle is named, famously described while Chief Justice of the Iowa Supreme Court: "Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control." City of Clinton

_____

[3] Applicant argues that the Civil Division's most recent determination includes an acknowledgment of her easement over the 10 foot wide green strip separating her Property from the paved roadway portion of Chittenden Drive. See Regan v. Pomerleau, No. S0239-11 CnCv (Vt. Super. Ct. Civ. Div. Oct. 27, 2011) (Crawford, J.).

4

v. Cedar Rapids & Mo. River R.R., 24 Iowa 455, 475 (1868). Dillon's Rule operates as a canon of construction requiring us to consider whether an enabling statute limits the powers that municipalities claim to have. See Valcour v. Vill. of Morrisville, 104 Vt. 119, 130 (1932) ( "[I]f any fair, reasonable, substantial doubt exists concerning [a grant of power,] it must be resolved against the [municipality], and its power denied."). With these legal standards in mind, we set about to apply the undisputed facts concerning Applicant's proposed subdivision to the legal standards codified in CDO § 5.2.2

### a. The definition of "public road" for purposes of CDO § 5.2.2.

First, we turn to the question of the meaning of "public road," looking to the CDO itself, the state enabling statute, and relevant case law.

The CDO does not define "public road." It defines "public use" as one "that is owned and operated by a public agency, or by a private/non-profit entity for use by the general public without unreasonable restriction." CDO § 13.1.2. It defines "road" with the words "see street," whose definition includes "a private way devoted to public use." Id. The definition for "street" continues, "The word 'street' shall include the entire width between property lines of every way used for vehicular and pedestrian travel which has become public by authority of the law, and such ways on public places other than highways as the public is permitted to use for vehicular and pedestrian traffic." Id. By combining these terms, it is conceivable that the City meant for "public road" to include private streets maintained for use by the public for pedestrian and vehicular traffic, at least for the purposes of CDO § 5.2.2.

It is not apparent that the CDO's drafters intended such a broad definition of "public road." Even if they did, however, such a broad definition appears to exceed the City's statutory authority. Under Vermont law, municipalities "may define and regulate land development" in any manner they establish in their bylaws; however, they may not enact bylaws that directly conflict with the several specified state laws relating to municipal and regional planning. 24 V.S.A. § 4410. One of these laws with which municipal bylaws shall not conflict is 24 V.S.A. § 4412. Part 3 of 24 V.S.A. § 4412 directly corresponds to (and is the enabling statute for) CDO § 5.2.2, addressing frontage on public roads. Specifically, the state statute prohibits development on lots that lack frontage on public roads or public waters.[4] 24 V.S.A. § 4412(3).

_____

[4] The section is entitled "Required frontage on, or access to, public roads or public waters" and begins, "Land development may be permitted on lots that do not have frontage either on a public road or public

5

The "definitions" section applicable to this prohibition is 24 V.S.A. §4303,[5] and its definition of "public road" does not include private ways maintained for public use. Rather, the statute defines "public road" as "a state highway as defined in 19 V.S.A. § 1 or a class 1, 2, or 3 town highway as defined in 19 V.S.A. § 302(a)."[6] 24 V.S.A. §4303(33). As explained in more detail below, neither the "state highway" classification in 19 V.S.A. §1 nor the "class 1, 2, or 3 town highway" classification in 19 V.S.A. § 302(a) include private ways maintained for public use. Given the verbiage used in the enabling statute, we conclude that the City zoning ordinance may not define "public road" more broadly than the enabling statute does.

Although the legislature added the "public road" definition subsequent to Applicant's 2009 application (2011 Adj. Sess., No. 155, § 13, eff. July 1, 2012),[7] where circumstances clearly indicate that a legislative body intended merely to clarify an existing law though subsequent amendment, courts can apply the clarification without implicating concerns about retroactive application. King v. American Airlines, 284 F.3d 352, 358 n.3 (2d Cir. N.Y. 2002) (citation omitted); see also State v. Thompson, 174 Vt. 172, 178 (2002) (where state legislature amended a statute to add a definition for a previously undefined term, the change constituted a clarification rather than a substantive change in law, as circumstances clearly indicated this to

---

waters. . . ." 24 V.S.A. § 4412(3) (emphasis added). Although the statute does not contain a separate sentence explicitly requiring frontage on a public road or public waters, the title makes clear that such frontage is required. Moreover, a prior version of the statute stated, "No land development may be permitted on lots which do not either have frontage on a public road or public waters or, with the approval of the planning commission[,] access to such a road or waters by a permanent easement or right-of-way at least twenty feet in width." 24 V.S.A. §4406(2). Of course, 24 V.S.A. § 4412(3) also makes an exception for access ways, discussed in more detail later in this decision.

[5] This definitions section applies to all of Title 24, Chapter 117: Municipal and Regional Planning and Development.

[6] It additionally states, "A municipality may, at its discretion, define a public road to also include a class 4 town highway as defined in 19 V.S.A. § 302(a)." Since the City has not done so in this case, we conclude that that portion of the definition is not relevant to our analysis. Class 4 town highways "are all town highways that are not class 1, 2, or 3 town highways or unidentified corridors. The selectboard shall determine which highways are class 4 town highways." 19 V.S.A. § 302(a)(3). There is no evidence suggesting that the City's selectboard has determined Chittenden Drive to be a class 4 town highway.

[7] The same adjudicative session also added "class 4 town highways" to 24 V.S.A. § 4412(3) such that it is now entitled "Required frontage on, or access to, public roads class 4 town highways, or public waters" and begins, "Land development may be permitted on lots that do not have frontage either on a public road, class 4 town highway or public waters. . .." 24 V.S.A. § 4412(3) (emphasis added). Unlike the amendment to the definition section that merely clarified a preexisting term, the amendment adding "class 4 town highway" to the statute affirmatively adds a distinct category in addition to public roads and public waters. Thus, we do not consider whether Chittenden Drive is a "class 4 town highway." Instead, we simply interpret the meaning of "public road."

be the legislature's intent). In assessing the import of a statutory amendment, courts presume that the legislature made changes in the law in light of relevant Supreme Court decisions. State v. Messier, 2005 VT 98, ¶ 10, 178 Vt. 412 (quoting Thayer v. Herdt, 155 Vt. 448, 453 (1990)). In light of this precedent and the surrounding circumstances, we conclude that this more detailed definition for "public road" was a legislative effort to clarify and not to impose a wholly different definition for the term than had developed through caselaw.

Here, circumstances clearly indicate that the legislature added a definition of "public road" merely to clarify existing law, and thus our interpretation does not implicate concerns about retroactive application. In particular, the definition incorporates the longstanding precedent from the Vermont Supreme Court's ruling in Okemo, 164 Vt. 447. In Okemo, a landowner's property abutted a road owned by the State of Vermont, which leased portions of the state lands to Okemo Mountain, Inc. for winter use as a ski trail. Id. In considering whether the road was public for purposes of satisfying a municipal ordinance requirement of frontage on a public road, the Vermont Supreme Court noted that neither the municipal ordinance nor its state enabling statute[8] defined the term, so it interpreted a definition applicable to both. Id. at 454. Noting that Black's Law Dictionary listed "public road" as synonymous with "highway," the Court turned to the definition of "highway" found in 19 V.S.A. § 1(12) ("State Highway Law"). Id. at 454-55. In its most recent act of adding a definition of "public road" that refers to 19 V.S.A. § 1, the Vermont Legislature appears to have simply incorporated the wisdom of the Supreme Court's 1995 Okemo decision.

In sum, because the state enabling statute forbids development on lots lacking frontage on public roads, municipalities lack the authority to define "public road" more broadly than the enabling statute does. Even if the City desires to consider Chittenden Drive "a thoroughfare open for public use" that meets the definition of a public road for purposes of the CDO, (City's Resp. to DeForest Realty's Cross-Mot. for Summ. J. at 1, filed Jun. 22, 2012), it lacks the power to do so. The question of whether Chittenden Drive is "public" depends on whether it meets the definition in 24 V.S.A. §4303(33) of "a state highway as defined in 19 V.S.A. § 1 or a class 1, 2, or 3 town highway as defined in 19 V.S.A. § 302(a)."

---

[8] At that time, the relevant enabling statute was 24 V.S.A. §4406(2), stating, "No land development may be permitted on lots which do not either have frontage on a public road or public waters or, with the approval of the planning commission access to such a road or waters by a permanent easement or right-of-way at least twenty feet in width." The Town of Ludlow had adopted similar language in its zoning ordinance.

In the next section, we consider whether Chittenden Drive meets this definition for "public road" or provides sufficient access to another road that is a public road. For the reasons detailed below, we conclude that it would be improper for us to summarily offer a conclusion on either of these legal issues, based upon the evidence currently presented.

### b. **Whether Chittenden Drive meets the definition of "public road."**

Chittenden Drive is not a class 1 or 2 town highway as defined in 19 V.S.A. § 302(a), as these terms are both statutorily defined as major roads. Class 3 town highways "are all traveled town highways other than class 1 or 2 highways. The selectmen, after conference with a representative of the [Vermont Agency of Transportation] shall determine which highways are class 3 town highways." Id. The section goes on to describe minimum standards for class 3 highways for stability and safe access. Id. There has been no evidence presented in the current record to suggest that the City has determined Chittenden Drive to be a class 3 highway; there is certainly no evidence that the City has done so in consultation with a representative of the Agency of Transportation.

Turning next to 19 V.S.A. § 1, "highways" are defined as:

> only such as are laid out in the manner prescribed by statute; or roads which have been constructed for public travel over land which has been conveyed to and accepted by a municipal corporation or to the state by deed of a fee or easement interest; or roads which have been dedicated to the public use and accepted by the city or town in which such roads are located; or such as may be from time to time laid out by the [Vermont Agency of Transportation] or town. . .

19 V.S.A. §1(12) (emphasis added). Chittenden Drive was not laid out by statute, nor has any party suggested that the state holds a deeded fee or easement interest or that the Agency of Transportation or the City formally laid out the road. One point, however, appears clear with regard to Chittenden Drive: we do not have sufficient undisputed material evidence in the record currently before us to decide on summary judgment whether Chittenden Drive was "dedicated to the public use and accepted by" the City per 19 V.S.A. §1(12).

Although "[t]he essential element [of dedication] is the intent of the owner," (Okemo, 164 Vt. 454-455), it is well settled that an individual's conduct can demonstrate an intent to dedicate land, even over that individual's assertions of ownership. See Druke v. Town of Newfane, 137 Vt. 571 (1979). Indeed, "[t]he allowance by the owners of repairs at public expense is one circumstance that strongly tends to show the intent to dedicate." Town of Springfield v. Newton, 115 Vt. 39, 43-44 (1947) (citation omitted). Similarly, acceptance may be

either express or implied, and a municipality's choice to undertake road repairs and maintenance may support an inference of acceptance. Druke, 137 Vt. 571, 576.

Although both Applicant and the City have suggested that the City performs at least some maintenance activity on Chittenden Drive, the parties dispute the extent of that activity. Although Applicant asserts—and Friends do not dispute—that members of the public use the road (Friends' Answer to Applicant's Statement of Material Facts at 1, filed May 21, 2010), it is unclear to what extent. Neither Appellant asserts that DeForest performs or ever performed maintenance on the road, nor that DeForest ever excluded members of the general public from using the road. However, the public's use of and the City's maintenance of Chittenden Drive are disputed material facts relevant to the factual determination of whether the road was dedicated and accepted under 19 V.S.A. § 1. [9]

### c. Whether the access way exception applies.

Aside from the date restriction, Applicant's proposed lots appear to meet the access drive exception in CDO § 5.2.2. The Civil Division of the Vermont Superior Court has already determined that Applicant's Property—and future subdivided portions thereof—has an implied easement entitling their owners to cross over the 10-foot wide  green strip between the Property and Chittenden Drive and to make any legal use of Chittenden Drive. Regan v. Pomerleau, No. S0239-11 CnCv, slip op. at 2-4 (Vt. Super. Ct. Civ. Div. Oct. 27, 2011) (Crawford, J.). Undisputed material facts establish that Chittenden Drive is a 30-foot-wide paved road that connects to a public road (Route 7), contains water and sewer lines, and serves several existing residences. It thus provides access to a public road by a permanent easement or right-of-way of at least twenty-five (25) feet in width as required by CDO § 5.2.2. We now turn to the date restriction.

We reject Applicant's assertion that the enabling statute requires municipalities to allow development on properties that lack frontage on a public road where appropriately-sized access ways exist. The enabling statute is clear that municipalities "may" choose to allow access ways in lieu of frontage on public roads; it simply requires that when they choose to do so, they must approve such access ways through proper procedure and ensure that they are at least 20 feet

---

[9] However, see CDO § 10.1.12, setting up strict requirements for dedication and acceptance, which appears to provide the City Council with exclusive authority to accept city streets, and to state that streets remain private until so accepted. We leave it to the parties to research and provide legal arguments at trial on the applicability of CDO § 10.1.12 to the facts presented in this appeal, and under applicable case law.

wide. 24 V.S.A. § 4412(3). We agree with Applicants that § 4412 is mandatory, but only as to the approval procedures used and the minimum width of the access drive.

Thus, the City could have chosen not to allow any development at all on lots lacking frontage on public roads. Indeed, the City already ensures that new subdivision occurs only on public roads: it now <u>requires</u> subdivision developers to dedicate and convey to the City all roads within proposed subdivisions. CDO § 10.1.12(b). For new subdivision developments, the requirement in CDO § 5.2.2 that lots created after January 1, 2007 have frontage on a public road simply mirrors the requirement in CDO § 10.1.12(b). Rather, the question is whether the City's provision of the access way exception only for lots created before January 1, 2007 is valid as applied to pre-existing subdivisions.

This is a question we decline to resolve on summary judgment, as the parties and their advocates deserve the opportunity to argue as to whether this restriction has a rational relation to the purpose of CDO Article 5 and whether applying the provision could lead to absurd results in this case. In particular, we will be considering the safety implications—or lack thereof—of subdivision and development on lots with frontage on a 30-foot-wide paved road that has served several residences for decades and that already contains water and sewer lines. We are particularly concerned about a literal application of CDO § 5.2.2, because the definition of "development" includes the act of subdivision itself. CDO § 13.1.2.

For the reasons stated above we **DENY** summary judgment on this question of whether Applicant's proposal conforms to CDO § 5.2.2.

## II.    CDO § 4.4.5 (dimensional requirements in residential districts)

Appellants ask whether the proposed subdivision will violate CDO § 4.4.5.[10] Article 4 of the CDO is entitled "Zoning Maps and Districts," and CDO §4.4.5 lists the dimensional standards applicable in residential zoning districts, including the RL District. Appellants do not challenge whether the proposed building envelope[11] adheres to the specific dimensional standards: minimum lot size, minimum frontage, base residential density, maximum lot

---

[10]  Both DeForest's and Friends' Statements of Questions challenge Applicant's compliance with this section of the CDO, but because only Friends briefed the issue, we address only Friends' arguments.

[11]  Although Applicant proposes no construction, her plan does include a building envelope. Acknowledging that no construction is proposed, we nonetheless examine the proposed building envelope to the extent that it enters into our determination of whether subdivision is appropriate.

coverage, maximum building height, and building setbacks.[12] Instead, Friends argue that the proposal fails to comply with the underlined purpose provision of the Residential Districts section, which provides:

> The Residential Districts are intended to control development in residential districts in order to create a safe, livable, and pedestrian friendly environment. They are also intended to create an inviting streetscape for residents and visitors. Development that places emphasis on architectural details and form is encouraged, where primary buildings and entrances are oriented to the sidewalk, and historic development patterns are reinforced. Parking shall be placed either behind, within, or to the side of structures, as is consistent with the district and/or the neighborhood. Building facades designed for parking shall be secondary to the residential aspect of a structure.

CDO §4.4.5(a).

Friends contend that Applicant's proposal is inconsistent with historic development patterns insofar as neighboring lots are large, with symmetrical configurations and lot lines extending perpendicularly or radially from the streets. They allege that Applicant's proposal "is smaller in size to the others in the neighborhood, has an irregular shape[,] and angled building envelope. (Exhibit N)." (Friends' Opp'n to Applicant's Mot. for Summ. J. at 7, filed May 21, 2010). They state that building envelopes in the neighborhood are generally centered within lot lines with façades directly oriented toward street frontage, whereas a future building on Applicant's proposed subdivided lot would have a "significantly smaller" façade that would not be oriented toward the street. Id.

We do not see any map in the record depicting the current configurations of other houses on lots in the neighborhood or the size of their façades. While we can see lot lines in the neighborhood on Exhibit 14, and we can see the building envelope proposed for the vacant subdivided lot (Lot 1) on Exhibit 3, Appellants have not provided evidence on the other buildings in the neighborhood. Thus, we lack a point of comparison.[13] Neither party has established that undisputed material facts exist that support as a matter of law a grant of summary judgment in their favor.

---

[12] Indeed, Friends concede that "Applicant arguably meets the dimensional requirements of the RL district." (Friends' Opp'n to Applicant's Mot. for Summ. J. at 8, filed May 21, 2012).

[13] Appellants Friends include a spreadsheet document (Exhibit 14) that appears to list the acreage of other lots on Chittenden Drive, calculating average and median acreage; however this document has no indicia of authorship or reliability.

Even if Friends' claims are accurate, the purpose provision in CDO § 4.4.5(a), while the source of helpful guidance, does not constitute enforceable regulatory language. When a zoning bylaw consists only of aspirational language and therefore does not provide specific notice of what development activity will be allowed or prohibited, it cannot be said to impose a regulatory restriction, even though purpose provisions in zoning bylaws provide helpful context and direction on what the regulatory provisions are intended to accomplish. See In re Rivers Development, LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Jan. 8, 2008) (Durkin, J.) (stating that regulatory language directing what a project "should" include or consider is aspirational and not mandatory in nature). Moreover, our Supreme Court has directed that since land use regulations are in derogation of private property rights, they "must be construed narrowly in favor of the land owner." In re Toor & Toor Living Trust NOV, 2012 VT 63 ¶9 (citing In re Appeal of Weeks, 167 Vt. 551, 555 (1998) & In re Vitale, 151 Vt. 580, 584 (1989)).

The purpose provision that Friends cite merely recites what the CDO's drafters, in choosing specific dimensional limits, intended to do. The provision "encourages," rather than mandates, development that orients primary buildings and entrances to the sidewalk and reinforces historic development patterns. CDO §4.4.5(a). The word "shall" appears only in relation to parking, and there is nothing on the record indicating that Applicant's proposed new lot fails to comply with this provision.[14] Particularly in light of our mandate to construe land use regulations narrowly in favor of the property owner, we cannot agree with Appellant Friends' argument that Applicant's proposal violates the language of the purpose provision of CDO § 4.4.5.

Additionally, we have examined the dimensional requirements listed in CDO § 4.4.5 and determined that the proposal complies with them, with one potential exception: density. The CDO limits density to seven dwelling units per acre in the RL District. CDO §4, Table 4.4.5-2. Applicant proposes to divide her property into two lots: one containing 11,326 square feet (where the single family residence is currently located) and another containing 6,330 square feet. The CDO mandates the following method for calculating density on a dwelling unit per acre basis:

---

[14] Friends argue that parking for the proposed site "is designated in the front of the building envelope," (Friends' Opp'n to Applicant's Mot. for Summ. J. at 8, filed May 21, 2012), but provide no evidence in support of this statement.

> The total number of dwelling units provided on a development site . . . shall be divided by the gross site area expressed in acres. In calculating the number of residential units permitted, fractional units of less than five-tenths (0.5) shall be rounded down to the nearest whole number and fractional units of five-tenths (0.5) or greater shall be rounded up to the nearest whole number. Any rounding of fractional units shall be limited to a single final calculation for any development.

CDO § 5.2.7(a)(1). Using this method of calculation and assuming <u>one</u> dwelling unit per lot, neither lot in the proposed subdivision would violate the density limit of no more than the equivalent of seven dwelling units per acre.[15]

However, the coordinated accessory use case that we have previously decided requires us to expand our discussion of density. That case concerns Friends' appeal of the DRB decision granting Applicant a permit for an accessory dwelling unit within the existing single family home located on the Property. See <u>Regan Accessory Use Permit Application</u>, No. 117-7-12 Vtec (Vt. Envtl. Ct. Dec. 14, 2012) (Durkin, J.). There, we affirmed the DRB's grant of the accessory use permit based on the current size of Applicant's Property, but the subdivision that Applicant proposes would put the 11,326 square foot lot with the existing house (including its newly approved accessory use) in nonconformity with density requirements, as <u>two</u> dwelling units on that lot could result in a density of over seven dwelling units per acre.

Thus, although we **GRANT** Appellant summary judgment as to her proposed subdivision's compliance with CDO § 4.4.5, we will require prior to trial that Applicant revise her plans and disclose her revised plans to the other parties at least thirty days prior to trial to ensure that (1) the parcel with the existing house and accessory unit and (2) the subdivided parcel with the potential for one residential unit <u>both</u> conform to the CDO's density requirements, and that such changes do not put either parcel out of conformity with setback requirements or other provisions of the CDO.

### III.   CDO § 6.0.1 (Architectural Review development principles)

Appellants ask whether the proposed subdivision will violate CDO § 6.0.1, the "Intent and Citywide Development Principles" explanation for the CDO's Article 6, which provides

---

[15] We calculate that a single dwelling unit on a lot containing 0.26 of an acre (i.e.: Lot 2) equates to a density of just under four dwelling units per acre; a single dwelling unit on a lot containing 0.1453 of an acre equates to a density of just under seven dwelling units per acre.

development principles and design standards.[16]  Specifically, Friends note that the CDO states that the lettered "development principles" "serve as the highest order of importance in cases where individual standards appear to conflict and greater discretion on the part of the DRB is required."   CDO § 6.0.1.   Friends allege that Applicant's plan violates the development provision stating that development in the City shall "[c]omplement Burlington's architectural and cultural heritage by conserving and/or reflecting dominant design elements and characteristics of neighborhoods, and maintaining neighborhood proportions of scale and mass."  CDO § 6.0.1(f).

Purpose statements in municipal zoning bylaws guide the interpretation and enforcement of the bylaws' remaining regulatory provisions, but generally have "no direct regulatory effect."  In re Meaker, 156 Vt. 182, 185 (1991).  This does not mean, however, that purpose provisions never contain enforceable regulatory language.  For example, the word "shall" imposes a mandatory requirement, no matter where it may appear in a municipal zoning regulation.  In re Verizon Wireless Barton Permit, No. 133-6-08 Vtec, slip op at 8 (Vt. Envtl. Ct. May 20, 2009) (Durkin, J.).  Even where a provision contains mandatory language, however, the provision will be unenforceable where its language is standardless.  In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 12–14, 185 Vt. 201.  In JAM Golf, the Vermont Supreme Court refused to enforce a municipal ordinance requiring planned residential development designs to "protect important natural resources including streams, wetlands, scenic views, wildlife habitats and special features," stating that the ordinance provided no standards that a court could use to determine what constituted a failure to "protect" the listed resources.  Id.

Despite its use of the word "shall," we find CDO § 6.0.1(f) to be standardless and therefore unenforceable.  The provision gives courts no guidance on how to determine what constitutes a failure to "reflect dominant design elements and characteristics of the neighborhood."  Furthermore, the detailed dimensional standards for development in CDO's Article 4 (discussed above) are the clearest implementation of the mandate in § 6.0.1(f) to "maintain[] neighborhood proportions of scale and mass."  We refrain from specifically voiding CDO § 6.0.1(f), since it provides important and helpful guidance of what the City aspires for its zoning regulations to accomplish, but we decline to rely upon CDO § 6.0.1(f) to specifically

---

[16]  As with CDO § 4.4.5, both DeForest's and Friends' Statements of Questions challenge Applicant's compliance with CDO § 6.0.1, but because only Friends briefed the issue, we address only Friends' arguments.

14

judge Applicant's proposed subdivision, since we are left to guess at what standards to apply when considering the application.

Finally, we note that Applicant proposes no construction at this time; she merely provides a sketch with a potential building envelope for the purposes of determining whether her subdivision lines would allow compliance with setback requirements. If and when the DRB considers a proposal for construction on the site, it is tasked with carefully considering both aspirational and mandatory portions of the CDO (including the architectural review development standards), giving each its proper weight.

Thus, we **GRANT** summary judgment in favor of Applicant on the question of whether her proposed subdivision, with no construction proposed, complies with CDO § 6.0.1.

## IV.    CDO § 6.1.2  (Land division design review standards)

Appellants[17] ask whether the proposed subdivision will violate CDO § 6.1.2, which sets forth general standards for reviewing development. The design review standards provide "specific direction" for implementing the more general development principles set out at the beginning of CDO Article 6. The CDO explains that the design standards "include both required ("shall") and flexible ("should") components. It is understood that many of the standards presented are not the only options available, and creativity is encouraged to achieve the desired result." CDO § 6.0.1. Thus we read the standards according to whether their provisions are requirements or flexible suggestions.

Specifically, Friends contend that Applicant's plan fails to meet CDO § 6.1.2(c), which states in its entirety:

> The size and arrangement of new lots <u>shall</u> reflect and perpetuate the existing development pattern of the surrounding neighborhood. Lots <u>shall</u> be created in such a way as to enable their development pursuant to the requirements of this ordinance, and ensure a clear transfer of title.
>
> Interior lot lines extending from a street <u>should</u> be perpendicular or radial to the street right-of-way line to the greatest extent feasible. Flag lots and through lots are discouraged, and shall be allowed only to the extent where topography and existing block and lot arrangement allow no suitable alternative. In such cases, a minimum frontage for access of 20-feet shall be required.

---

[17] Here again, both DeForest's and Friends' statements of questions challenge Applicant's compliance with CDO § 6.1.2, but because only Friends briefed the issue, we address only Friends' arguments.

CDO § 6.1.2(c) (emphasis added). The first paragraph of this standard contains mandatory language. The language from the first sentence ("reflect and perpetuate the existing development pattern of the surrounding neighborhood") is insufficiently specific, standing alone, to provide enforceable standards. We interpret the second sentence's reference to "the requirements of this ordinance" as referring to the CDO's detailed dimensional requirements. As discussed above and incorporating our condition regarding residential density, Applicant's proposal conforms to them. We are satisfied that those dimensional requirements provide conditions and safeguards sufficient for us to conclude that the subdivision would adequately reflect the existing development pattern in this neighborhood that the City has chosen to classify an RL zone. The second paragraph of this section is a flexible standard, and only suggests that lot lines be perpendicular or radial to the street "to the greatest extent feasible." The drawing that Applicant has submitted shows lot lines that appear in part perpendicular and in part somewhat angled, the latter due to the need to accommodate 60 feet of street frontage. Thus, the lines are perpendicular or radial "to the greatest extent feasible." We have reviewed the remainder of CDO § 6.1.2 and find the Applicant's proposal to be in compliance. We therefore **GRANT** Applicant's motion as to her compliance with CDO § 6.1.2.

## V. CDO § 3.2.2

Appellants ask whether the proposed subdivision will violate CDO § 3.2.2, which requires compliance with the dimensional standards in the CDO's Article 4 and the development standards in its Article 6. As we concluded above that the proposal does not violate those provisions, we conclude that it does not violate CDO § 3.2.2, and we **GRANT** Applicant's motion for summary judgment on the issue of her compliance with CDO § 3.2.2.

### Conclusion

For the reasons stated above, we **DENY** all motions and cross motions for summary judgment as to whether Applicant's proposal complies with CDO § 5.2.2 regarding frontage on a public road. We find that Applicant's proposal complies with CDO §§ 6.0.1, 6.1.2, and 3.2.2 and we therefore **GRANT** Applicant's motion as to Appellants' questions relating to those provisions. We **GRANT** Applicant's motion for summary judgment as to whether her proposal complies with CDO § 4.4.5 on the condition that the Applicant revise her plans to ensure that both subdivided lots conform to the CDO's density requirements, and that such changes do not put the project out of conformity with setback requirements or other provisions of the CDO.

16

In light of our rulings here, we understand that the following legal issues remain for our consideration at trial:

- Appellant Defrost Realty, Inc.'s Questions 1 and 4 from its Statement of Questions filed October 15, 2009;
- Appellant Friends of Chittenden Drive Question 3 from its Statement of Questions filed October 22, 2009; and
- Applicant's one and only Question (concerning the DRB Condition 3) included in her Statement of Questions filed November 20, 2009.

This matter now appears ready for trial. We direct all parties, by Monday, January 7, 2013, to provide the Court, in writing, with a list of their and their witnesses' unavailable dates for trial during the month of February, 2013, together with their respective estimates of how many days may be required to complete the trial. The Court will thereafter set the matter for a final pre-trial conference and trial.

Done at Newfane, Vermont this 18th day of December, 2012.

_____
Thomas S. Durkin, Environmental Judge