## Christopher Gade and Tere Gade, et al. v. Chittenden Solid Waste District and Town of Williston

[989 A.2d 491]

No. 08-462

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Teachout, Supr. J., Specially Assigned**

Opinion Filed November 13, 2009

*Mark L. Sperry* and *Erin Miller Heins* of *Langrock Sperry & Wool, LLP*, Burlington, for Plaintiffs-Appellants.

*Jon Anderson* and *David W. Rugh* of *Burak Anderson & Melloni, PLC*, Burlington, for Defendant-Appellee Chittenden Solid Waste District.

*Paul S. Gillies* and *Daniel P. Richardson* of *Tarrant, Marks & Gillies*, Montpelier, for Defendant-Appellee Town of Williston.

¶ 1. **Johnson, J.** A group of homeowners residing in the Town of Williston filed a complaint in Chittenden Superior Court, alleging that the Town's agreement with Chittenden Solid Waste District for the siting, construction, and operation of a solid waste disposal

facility in the Town was an ultra vires delegation of municipal authority. Homeowners appeal the superior court's decision upholding the agreement. We affirm.

¶ 2. In 1977, the Legislature created a state-wide waste-management system to assure proper disposal of municipal waste and to provide leadership and guidance to individual municipalities in implementing waste management plans. See 10 V.S.A. §§ 6601-6632 (creating a state-wide waste-management scheme); see also *id.* § 6601 (stating legislative purpose). The Legislature required each municipality to either join a solid waste management district or work with its regional planning commission in developing a waste management plan. 24 V.S.A. § 2202a(c)(1). The cities, towns, and villages of Chittenden County — including the Town of Williston — formed and then joined the Chittenden Solid Waste District (CSWD) for the collective disposal of their solid waste.

¶ 3. In 1991, the Legislature granted CSWD its charter, outlining its powers and responsibilities, which specifically include the power to make contracts. 24 V.S.A. app. ch. 405 §§ 1-63. Under this charter, each constituent town appoints one commissioner to CSWD's Board of Commissioners. *Id.* § 7. After the State granted the charter, CSWD began the process of siting the landfill and chose a site in the Town of Williston, adjacent to the Town's existing landfill. The Town agreed to the placement of the landfill, and in 1992, the Town and CSWD negotiated the Host Town Agreement (HTA), outlining each party's rights and responsibilities. Among the HTA's provisions are the Town's promise to use its "best efforts" to support CSWD in obtaining all necessary permits and licenses as well as the Town's warranty that CSWD's proposal complies with the town plan. In March 1992, all towns in CSWD, including Williston, held a special meeting to discuss and vote on the HTA. All approved the HTA.

¶ 4. CSWD then took possession of the Town's existing landfill and began the condemnation and development process on the site. This process has taken almost twenty years and has continued at considerable expense — at least $5,000,000 — to CSWD. CSWD's efforts to condemn the site have resulted in litigation before this Court on three previous occasions, each appeal concerning a different aspect of the condemnation proceedings. See *In re Chittenden Solid Waste Dist.*, 163 Vt. 185, 657 A.2d 197 (1995) (appealing denial of petition to condemn the landfill site);

*Chittenden Solid Waste Dist. v. Hinesburg Sand & Gravel Co.*, 169 Vt. 153, 730 A.2d 614 (1999) (condemnee appealing trial court's judgment for CSWD on remand); *In re Chittenden Solid Waste Dist.*, 2007 VT 28, 182 Vt. 38, 928 A.2d 1183 (condemnee appealing damage award).

¶ 5. Homeowners are twenty-five residents of a Williston development and all live between 0.25 and 0.8 miles from the proposed landfill site. In March 2007, homeowners filed this declaratory judgment action against both the Town and CSWD, asking the court to rule the HTA void as an illegal delegation of municipal authority. The Town and CSWD moved for summary judgment and homeowners cross-moved for summary judgment. The trial court granted CSWD's and the Town's motions for summary judgment and denied homeowners' cross-motion. The court ruled that the Town had not illegally delegated its municipal authority by agreeing to support CSWD in its permitting applications and found that certification of the facility was not a prerequisite for the Town's ability to contract for payment from CSWD. The court also ruled that given the statutory authority for the Town to enter into the HTA, the lack of a termination date did not render the contract between the Town and CSWD void.[1] Following the trial court's ruling, homeowners appealed to this Court.

¶ 6. On appeal, homeowners make two arguments. First, homeowners contend that by promising to support CSWD in its permit applications and warranting that CSWD's plans conform with the town plan, the Town illegally delegated its statutory authority regarding construction, permitting, and operation of solid waste disposal facilities. Homeowners argue that this delegation makes the contract ultra vires and therefore void ab initio. Second, homeowners argue that the HTA is void because it does not include a termination date and binds the Town for an unreasonable amount of time.[2]

¶ 7. We review decisions on motions for summary judgment de novo, using the same standard as the trial court. *Mooney v. Town of Stowe*, 2008 VT 19, ¶ 5, 183 Vt. 600, 950 A.2d 1198 (mem.). Summary judgment is appropriate when, giving the benefit of all

---

[1] The trial court characterized the homeowners' lawsuit as a political question more appropriately addressed to bodies of local government, and ultimately not an issue for the courts.

[2] Because we find that the HTA is not void, we do not address Town and CSWD's arguments invoking standing, the statute of limitations, and principles of estoppel.

reasonable doubts and inferences to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(c). As the facts in this case are undisputed, our sole task is to determine whether homeowners, rather than the Town and CSWD, are legally entitled to summary judgment. See *Mooney*, 2008 VT 19, ¶ 5.

## I.

¶ 8. Homeowners argue that the Town impermissibly delegated its police powers when it entered into the HTA and that the HTA is void ab initio as an ultra vires act by a municipality. Homeowners rely on two provisions of the HTA to support this claim. First, homeowners point to Article IV, § 4.0 of the HTA, which obligates the Town to support CSWD in obtaining all necessary permits and licenses. That section provides:

> [T]he Town shall use its best efforts to assist the District in obtaining all necessary Approvals, licenses and permits for the acquisition, construction, operation, and management of the Landfills. Such best efforts shall include being a co-applicant with the District if requested by the District, attendance at permit hearings, testifying that the Town's concerns regarding the siting, construction, and operation of the Landfill have been adequately and fully addressed, and attendance at other public hearings in connection with the foregoing.

Homeowners argue that by promising to support CSWD in its Act 250 and municipal permit applications, the Town "has impermissibly contracted away to CSWD its statutory power to participate as an independent party in the permitting process for the proposed regional landfill."

¶ 9. Second, homeowners point to Article 4.0(c) of the HTA, which consists of a warranty in which Town represents that:

> The Town Board of Selectpersons has reviewed this agreement and the District's proposals for using [the site], and have agreed that the District's proposed uses of [the site] will . . . comply fully with
>
> (i) all of the criteria set forth at 10 V.S.A. § 6086(a) [Act 250], and
>
> (ii) the Town's duly adopted plan (if any).

Homeowners contend that this warranty amounts to an agreement with CSWD that the Town "will make its Town Plans conform to CSWD's plans for the proposed regional landfill without any independent evaluation."

¶ 10. In claiming that the Town entered into an illegal contract, homeowners attempt to characterize the HTA as both an abrogation of the Town's municipal authority as well as an illegal "contract zoning" situation in which a town bypasses permitting procedures and effectively pre-approves a project. Homeowners rely principally on our decision in *Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co.*, 151 Vt. 73, 558 A.2d 215 (1988) (hereinafter *MMWEC*). In *MMWEC*, we found that a contract between several municipalities and an electric power cooperative amounted to an illegal delegation of municipal authority where the contract was not authorized by the Legislature and involved delegation of virtually all present and future spending decisions. *Id.* at 86, 89-90, 558 A.2d at 223, 224-25. In casting the situation here as akin to the one we found illegal in *MMWEC*, homeowners have critically mischaracterized the Town's actions. The above HTA provisions represent only the Town's promise of cooperation and warranty of good faith in achieving the goals of a legislatively authorized contract. For reasons discussed below, these types of provisions are entirely permissible and, indeed, legislatively encouraged.

¶ 11. We preface our discussion of the two HTA provisions at issue by noting the explicit legislative sanction for the type of contract entered into by the Town and CSWD. This situation differs significantly from the one presented in *MMWEC*. See *id.* at 75, 558 A.2d at 218 (finding no explicit statutory authority for the type of electric power contract at issue). The Legislature has authorized municipalities to enter into contracts with a waste disposal district for the siting and management of landfills. 24 V.S.A. § 2202a(b) (providing that "[m]unicipalities may satisfy the requirements of the state solid waste management plan . . . through agreement between any other unit of government or any operator having a permit from the secretary"); 10 V.S.A. § 6603(3) (granting the Secretary of the Agency of Natural Resources the power to "[e]ncourage local units of government to manage solid waste problems within their respective jurisdictions, or by contract

on a cooperative regional or interstate basis"); 10 V.S.A. § 6603d(a) (requiring Secretary of Agency of Natural Resources to "issue a grant to a municipality, or a group of municipalities organized as a solid waste management district, to develop and implement a system of user fees for municipally operated solid waste management facilities"); 10 V.S.A. § 6603h (allowing municipality that serves as site for waste disposal facility to "negotiate a compensatory host payment from a solid waste district, a regional planning commission, the owner of the facility, or any combination of these"). In addition, CSWD's charter authorizes CSWD to enter into agreements for the siting of future solid waste disposal facilities. 24 V.S.A. app. ch. 405 § 5(31).[3]

¶ 12. The above statutory provisions indicate the Legislature's intent to support long-term contracts between municipalities and third parties for the management of waste disposal. Indeed, the purpose of these statutes is to encourage towns to develop long-term plans for the disposal of solid waste that are safe, efficient, and environmentally sound. See 10 V.S.A. § 6601(e) (purpose of law is that "state provide technical and financial leadership to municipalities for the siting of solid waste management facilities and the implementation of a program . . . that over the long term is sustainable, environmentally sound, and economically beneficial, and that encourages innovation and individual responsibility"). Therefore, we must construe the Town's obligations under the HTA in light of this legislative intent. See *In re Ambassador Ins. Co.*, 2008 VT 105, ¶ 18, 184 Vt. 408, 965 A.2d 486 (noting that "[i]n construing a statute, we aim to implement the intent of the Legislature").

 ¶ 13. First, a municipality's mere promise not to oppose the other party to the contract in its permit applications is entirely permissible, especially given the specific statutory authorization for the type of contract at issue here. The powers of a municipal corporation include both those powers granted in express words by statute and those powers necessarily or fairly implied in the powers expressly granted. See *Hunters, Anglers & Trappers Ass'n of Vt., Inc. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 7, 181 Vt. 12, 913 A.2d 391 ("We have consistently adhered

---

[3] Perhaps for this reason, homeowners explicitly do not challenge the Town's authority to enter into a contract with a third party for the disposal of municipal waste.

to the so-called Dillon's rule that a municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." (quotations omitted)). The Town's ability to pledge its cooperation to further the goals of the HTA is implicit in the Town's statutorily authorized ability to exercise its powers to contract with third parties for the siting, construction, and operation of waste disposal facilities.[4] We are hard-pressed to see how a contract between a municipality and a third party would operate if the municipality could withdraw its support for the joint venture at will. In granting the Town the power to enter into contracts with waste disposal districts, the Legislature could not possibly have intended to forbid the Town from using its best efforts to further the purpose of the contract.

¶ 14. Homeowners contend, however, that by contractually giving up its right to contest CSWD's permit application, the Town has abrogated its statutory right to exercise its party status in various permitting proceedings. This is a mischaracterization of the Town's action and authority. In the "best efforts" provisions, the Town has not ceded any legislatively derived power. Compare *MMWEC*, 151 Vt. at 83-85, 558 A.2d at 221-22 (finding an impermissible delegation of spending power when towns ceded all decisions to incur project debt to a third party and agreed to restrict spending on other projects). The Town does not have Act 250 decision-making authority, and its role in Act 250 proceedings is necessarily limited to either support of or objection to any given project. Indeed, the Town is not required to take any position in an Act 250 proceeding. See 10 V.S.A. § 6086(a) (giving district commissions the power to issue or deny a permit application according to whether requirements are met); *id.* § 6085(c)(1)(C) (giving the municipality in which a project site is located party status in proceedings before district commissions). Nor does the Town have independent authority to grant or deny zoning permits. 24 V.S.A. § 4449(a). Instead, CSWD must go before an indepen-

---

[4] General contract principles of fair dealing also support upholding promises of mutual support for the contract's purpose. See *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) (explaining that the implied covenant of good faith and fair dealing exists in every contract and ensures that each party work with "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" (quoting Restatement (Second) of Contracts § 205 cmt. a (1981))).

dent zoning administrator to show that it has complied with all applicable zoning laws. *Id.* The Town has a right to appeal any administrative zoning decision, but is not required to do so. 24 V.S.A. § 4465(b)(2).

¶ 15. Moreover, a pledge of cooperation stands in stark contrast to so-called "contract zoning" cases on which homeowners rely, in which the zoning or permitting authority itself contracts with a developer to pre-approve all permits arising under a project. See *Larkin v. City of Burlington*, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) (noting that "courts are likely to find illegal contract zoning . . . where there is an express bilateral agreement that bargains away the municipality's future use of the police power" (quotation omitted)); *Attman/Glazer P.B. Co. v. Mayor of Annapolis*, 552 A.2d 1277, 1282 (Md. 1989) (noting that a contract in which a municipality pre-commits itself to a zoning decision illegally preempts prescribed legislative procedures for zoning); *Prock v. Town of Danville*, 655 N.E.2d 553, 560 (Ind. Ct. App. 1995) (recognizing that a municipal corporation could not by contract legally bind itself to a future zoning decision).

¶ 16. Illegal contract zoning differs markedly from the situation before us because it involves circumvention of statutorily required public notice, hearings, and commission approvals to pre-approve certain permits. The HTA, in contrast, leaves the statutory scheme involving permit application and approval firmly intact. In addition, the HTA explicitly carves out an oversight role for the Town through representation on the District Coordinating Committee, which is tasked with resolving any disputes between the Town and CSWD.[5] The Town also retains control of waste disposal planning through its position as a voting member on CSWD's Board of Commissioners. 24 V.S.A. app. ch. 405 § 7. Most importantly, the Town has not guaranteed the success of CSWD's Act 250 or municipal zoning permit applications, nor could it. 24 V.S.A. § 4448. Instead, § 4.1 of Article IV of the HTA includes an express warranty by the Town that "[a]ny construction . . . must comply with all restrictions and conditions covering the land and

---

[5] The Coordinating Committee has six members: CSWD's general manager or a representative, CSWD's engineer or a representative, the chairperson of CSWD's Board of Commissioners or a representative, the Town manager or a representative, the director of Town's Department of Public Works or a representative, and a member of Town's Board of Selectpersons.

premises as outlined in any Approvals and with all applicable laws." The district commission at all times has the power to approve or reject the proposed permits.

¶ 17. Other states agree that, where the statutory scheme for approval of permits and licenses is left intact, a municipality's mere pledge to cooperate with a third party in obtaining necessary permits for a proposed project is not an illegal delegation. See *Save Elkhart Lake, Inc. v. Village of Elkhart Lake*, 512 N.W.2d 202, 205 (Wis. Ct. App. 1993). In *Save Elkhart Lake*, the Court of Appeals of Wisconsin validated a municipality's contractual promise to assist a private developer in processing applications for permits, variances, licenses, and other approvals in support of a development project within the municipality. The court found no language in the agreement that "guarantees the success of the project" or allows circumvention of applicable laws and concluded that the agreement, therefore, was not an illegal delegation of police powers. *Id.*; see also *City of Greenbelt v. Bresler*, 236 A.2d 1, 4-5 (Md. 1967) (upholding municipality's pledge of support of developer before zoning authority); *Town of Brockway v. City of Black River Falls*, 2005 WI App 174, ¶ 31, 702 N.W.2d 418 (finding that city does not impermissibly delegate its zoning power if the decision-making body remains free to approve or reject the requested rezoning). Like the municipality in *Save Elkhart Lake*, here, the Town has pledged its support of CSWD's permit and license applications, not assured their ultimate success.

¶ 18. Homeowners also mischaracterize the Town's warranty with regard to the town plan. Though homeowners contend that the Town has effectively pre-approved changes to the town plan to conform with CSWD's project, the very terms of the HTA contradict such a conclusion.

¶ 19. As discussed above, the HTA does not displace existing state permitting, licensing, and public hearing requirements. Because conformance with a town plan is an Act 250 requirement, CSWD's development plan necessarily will be independently evaluated in the permitting process to ensure compliance with the town plan. See 10 V.S.A. § 6086(a)(10) (requiring that any proposed development is "in conformance with any duly adopted local or regional plan or capital program"). Rather than a blanket assurance that any permit will be automatically granted, the HTA's terms require compliance with state permitting procedures. The

HTA provides only the Town's preliminary warranty to CSWD that at the time the parties entered into the HTA, CSWD's plans conformed with the town plan. The HTA explicitly acknowledges that CSWD may need to obtain new or amended permits.

¶ 20. Contrary to homeowners' insistence, our decision in *MMWEC* does not compel us to find an illegal delegation here. In *MMWEC*, we addressed the validity of a contract between several Vermont municipalities and an independent out-of-state agency (MMWEC) for shares of electric power. Under the agreement, the municipalities were entitled to amounts of electric capacity and energy, if any, that the project was capable of producing at any given time — meaning that the municipalities had to pay MMWEC whether or not MMWEC actually produced any electric power. 151 Vt. at 76, 558 A.2d at 217. The agreement also required the municipalities to delegate to MMWEC all power with regard to how the municipalities' contributions were spent as well as the power to make all management decisions regarding construction and operation of the project.

¶ 21. We concluded that no statutory authority empowered the towns to enter into a contract for mere "project capability." *Id.* at 78, 558 A.2d at 218. Although assigning proprietary functions, such as plant operation, to MMWEC may have been permissible, we found that the agreement went far beyond such an assignment. *Id.* at 86, 558 A.2d at 223. Essentially, the agreement amounted to an abdication of the municipalities' decision-making power with regard to how their contributions to MMWEC were spent. Finally, we concluded that the municipalities impermissibly restricted future legislative spending decisions by agreeing to liens on their utility revenues. *Id.* at 81-86, 558 A.2d at 220-23.

■ ¶ 22. We find the situation in *MMWEC* factually and legally distinguishable from the situation before us now. By ceding control of decisions concerning the spending of contributions and the incurrence of debt and by agreeing to restrict spending on other municipal projects, the municipalities in *MMWEC* impermissibly delegated their spending power; a power that is "one of the most fundamental of its legislative powers." *Id.* at 82, 558 A.2d at 220. Here, all that the Town did was promise to support CSWD in its permit applications and give its warranty of good faith with regard to the town plan. The HTA does not promise the success of these applications and explicitly leaves all independent permit-

ting procedures intact. The Town's actions do not amount to a delegation of any legislatively derived power. Further, in contrast to the municipalities in *MMWEC* who were acting outside of any legislative mandate, the Town is exercising the very power that the Legislature explicitly intended it to exercise.

## II.

¶ 23. Homeowners next contend that the HTA's failure to contain a termination clause impermissibly binds the Town to a contractual obligation for an unreasonable amount of time. We disagree.

¶ 24. The HTA is not void for its failure to include a termination clause. Rather, in the absence of contractual terms limiting the duration of the contract, we will imply a "reasonable time." *City of Barre v. Perry & Scribner*, 82 Vt. 301, 308, 73 A. 574, 576 (1909). In *Barre*, we addressed the validity of a water supply permit allowing a private business to lay pipes under city streets to provide water to city residents. The permit contained no fixed time limit. Despite the absence of a time limit, we denied a request to void the permit and held the permit valid for a "reasonable" time "in view of the nature of the subject-matter." *Id.* at 309, 73 A. at 577. The inquiry as to the reasonableness of the time period is necessarily fact-specific.[6]

¶ 25. Other courts dealing with the duration of municipal contracts have reached similar results. See, e.g., *Haines v. City of New York*, 364 N.E.2d 820, 822-23 (N.Y. 1977). In *Haines*, the New York Court of Appeals addressed a challenge to a contract between New York City and a water treatment company that lacked any term concerning duration. The court rejected the contention that the city was perpetually bound under the contract. *Id.* at 822. Instead, the court held that the city was obligated to perform under the contract "for a reasonable time." *Id.* Based on the subject matter of the contract, the court found that it was reasonable to infer that the parties intended the city to maintain the water treatment facility until such time as the city no longer needed the water. *Id.* at 823; see also *Barco Urban Renewal Corp.*

---

[6] For instance, in *Barre*, we found that the nature of the water supply contract was such that it was "reasonable" to allow the water company to lay additional pipes to give them use of pipes already laid, but at the same time held that the water company was precluded from enlarging the pipe system already in place. *Id.*

*v. Hous. Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) (implying "commercially reasonable time" for viability of right of first refusal contained in agreement between city housing authority and real estate developer where agreement was silent with regard to duration).

 ¶ 26. Like contracts for supply and treatment of water, the subject-matter of the HTA — construction and operation of a waste disposal system — is necessarily a long-term venture. A landfill, however, has a finite lifespan and lasts only so long as the landfill has capacity to hold solid waste. Variables and circumstances beyond the immediate control of the Town and CSWD make a definitive date upon which this capacity may be reached impossible to pinpoint. The necessarily limited lifespan of a landfill is a reasonable proxy for the contract's length, even if the exact date on which a landfill reaches its capacity cannot be precisely determined.[7] Therefore, the contract is not void for failure to specify that date.

*Affirmed.*

---

[7] General principles of contract law as well as principles governing municipal corporations add further support for the implication of a reasonable time limit in a contract where no time limit is provided. When a contract lacks a term essential to its performance, the court may supply a reasonable term, based on the subject matter of the contract. See Restatement (Second) of Contracts § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); see also 10A E. McQuillin, Municipal Corporations § 29.102, at 53 (3d ed. 1999) ("The fact that a city's contract is by its terms perpetual does not make it void as against public policy, where it is made pursuant to statutory authority delegated to the municipalities . . . .").