2014 VT 73

## Vermont North Properties v. The Village of Derby Center

[102 A.3d 1084]

No. 12-457

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed July 18, 2014

---

*Philip H. White* of *Wilson & White, P.C.*, Newport, for Plaintiff-Appellant.

*Christopher J. Smart* of *Cheney Saudek & Grayck PC*, Montpelier, for Defendant-Appellee.

¶ 1. **Robinson, J.** Developer Vermont North Properties (VNP) appeals from the trial court's decision in favor of the Village of Derby Center in this declaratory judgment action. This dispute concerns VNP's rights, if any, to water and sewer allocations from the systems managed by the Village in connection with a VNP construction project. The trial court determined that: the Village could charge fees for reserved water and sewer allocations; the Village's fees were reasonable; the Village could revoke VNP's reserved allocations for nonpayment of fees; and the Village was not estopped from denying water and sewer connections to VNP on account of nonpayment. For the reasons set forth below, we conclude that VNP has enforceable reserved water and sewer

allocations, but the Village may charge equitable fees for these reservations and may revoke the reservations for nonpayment. We further conclude that VNP has failed to meet its burden of demonstrating the unreasonableness of the Village's reservation fees, and on that basis we affirm the trial court's decision.

## I.

¶ 2. VNP filed this declaratory judgment action in June 2007. It asserted in its complaint, among other things, that it had obtained a vested right to certain allocations of reserved water and sewer capacity from the Village in 1987, that the Village had no authority to charge it a fee for these reservations, and that the sewer and water rates the Village sought to charge for the reservations were irrational, inequitable, and unlawful. The Village adopted new ordinances in 2008, and VNP filed an amended complaint with additional allegations relating to these ordinances and to other events that post-dated its original complaint. VNP asserted that the Village had improperly issued it a new permit in 2008 for provisional allocations of water and wastewater, and that the permit inappropriately provided that VNP's provisional allocations would expire on February 28, 2009 unless VNP either completed construction or applied to extend the deadline for good cause. VNP argued that, to the extent that the Village was threatening to rescind VNP's reserved water and sewer capacity, it was doing so in derogation of VNP's vested, grandfathered rights to such capacity.

¶ 3. Following a bench trial, the court adopted the parties' stipulated facts and made additional findings. Its decision thus reflects the following. In 1987, VNP purchased land in the Village. The sellers of the property had previously obtained a state permit to build "44 housing units in 8 buildings with a store/laundry facility" on the site. VNP planned to build eight buildings on the property, each containing six residential units. The buildings were to be constructed over time, based on market demand.

¶ 4. In March 1987, VNP applied for amended state permits to allow water and wastewater connections. Shortly thereafter, in connection with that state-permitting process, the Village clerk sent a letter to the state indicating that "water and sewer are available at the property." The clerk did not specify any specific quantity of water or wastewater capacity available for this project. She did not state how long water and sewer services would be

reserved. VNP understood this letter to be a commitment on the part of the Village to provide water and sewer necessary for the project. In July 1987, based, in part, on the letter from the Village clerk, the state issued a permit to VNP to construct two buildings, each with six units. VNP's first building was built and connected to the Village system in 1988.

¶ 5. The process for obtaining water and wastewater reservations and allocations from the Village was informal at the time; the Village did not have an ordinance relating to "reservations" or "allocations" of water or wastewater capacity, and Village trustees did not formally vote to approve a reservation of water and sewer capacity for VNP prior to the Village clerk sending the 1987 letter. The Village did not charge any fees for reservation of water or wastewater capacity during this period.

¶ 6. In 1989, a new state statute required that municipal wastewater capacity be allocated pursuant to ordinances or by-laws. See 24 V.S.A. § 3625. Until such ordinances or bylaws were adopted, municipalities' authority to allocate capacity was limited in amount and scope. *Id.* § 3625(b)(1)-(3). These provisions did not apply, however, "to capacity that is committed or allocated before July 1, 1989." *Id.* § 3625(e).

¶ 7. In 1992, in response to the new state statute, the Village adopted its first wastewater allocation ordinance. Not long thereafter, the Village sought legal advice from its attorney on whether it could charge a fee for reserving wastewater capacity prior to connection. The Village attorney opined that the Village could impose reservation fees but that any new ordinance should not be applied retroactively.

¶ 8. In August 1993, the Village and the Town of Derby adopted a joint wastewater allocation ordinance, which replaced the Village's 1992 ordinance; they also adopted a joint water ordinance.[1] Thereafter, the Village began charging water and wastewater reservation fees for newly allocated but unused water and sewer capacity prior to connection. It has charged these fees ever since. Sewer reservation fees were apparently imposed following trustee approval of a project at a rate of 25% of the established sewer rates. The fees were charged until a water meter was installed, at

---

[1] The 1993 wastewater ordinance and 1993 joint water ordinance remained in effect until December 6, 2008, when they were repealed.

which time a "connection fee" apparently was imposed.[2] In early 1994, consistent with his earlier advice, the Village attorney advised the Village trustees that they could not "charge connection fees to projects that received approval before the connection fees were in place."

¶ 9. In March 1994, VNP applied to the Village to connect the water and sewer for the second of the two buildings for which it had received state approval in 1987. Although no formal vote of approval had ever been taken by the Village trustees, the trustees decided at an April 1994 meeting that: "Water application 94-3 from VT North and VT North's Sewer Application 94-3 are . . . grandfathered in. The condominium project was allocated its water and sewer prior to the new ordinances. No action was necessary."

¶ 10. Shortly after the meeting, the Village sent VNP a form letter regarding VNP's water and sewer applications 94-3. The letter thanked VNP for submitting information about its project, but stated that because the water and sewer allocations to VNP predated the effective date of the water allocation/sewer allocation ordinances, another approval was not necessary. The letter also provided that because "the water/sewer approval(s) predate(s) the initiation of connection fees, the project is not subject to connection fees. Connection(s), however, will have to be inspected prior to being covered and you will be subject to the applicable ordinances."

¶ 11. VNP constructed and connected its second building to the Village system in late 1994. Seven years later, upon application by VNP, the state issued an amended permit in June 2001 allowing VNP to construct the third building in its project. VNP subsequently constructed its third building, which was also connected to the Village's systems. The Village's records regarding allocations

---

[2] The 1993 wastewater ordinance defined a "connection fee" as "a fee imposed upon persons desiring to connect to the Village sewers, which fee shall be as determined by the Board in accordance with the provisions of [24 V.S.A. § 3615], and which fee shall include, but not be limited to, Village's cost of performing, supplying materials, supervising, inspecting and administering a connection to the sewage system, including any necessary sewer-service extension and upgrading of sewers." The 1993 water ordinance defined "connection fee" as "a fee imposed on applicants for the right to connect to the public water system, which fee shall include the company's cost of performing, supplying materials, supervision, inspecting and administering a connection to the public water system, including any necessary water service extension or upgrade of lines."

of sewer services from 1994-2001 state that VNP had 10,800 gallons of "committed reserves."

¶ 12. Around 2004, the Village believed that it had run out of wastewater capacity. It learned that the state determined available wastewater capacity by adding the Village's actual discharges to the Village's reservations for prospective capacity as shown on a list maintained by the state. At the time, the combination of actual discharges and reservations appearing on the state's list approached the Village's capacity. The Village initiated a wastewater moratorium, began negotiating with the City of Newport to procure additional capacity, and began reviewing the state's reservation list to identify reservations that had not actually been approved by the Village, or that had expired.

¶ 13. In 2005, VNP secured a state permit and connection approval from the Village for an additional 1800 gallons per day (gpd) of water and sewer capacity in connection with construction of a fourth building. The Village sewerage capacity permit included an expiration date forty months after the date of issuance if construction did not begin on the units for which the allocation was reserved within that time frame. The fourth building was constructed and connected in October 2005.[3]

¶ 14. The Village determined around 2005 that it had not actually allocated water and sewer capacity to VNP as previously indicated, and that VNP's water and sewer allocations were not "grandfathered." Accordingly, pursuant to its 1993 ordinance, in 2006 the Village began billing VNP for its reservations. VNP objected to the bills and initially refused to pay them, and the Village indicated that unused water and sewer allocations would be revoked.

¶ 15. Also in 2006, under the authority of the 1993 ordinance, the Village trustees adopted new water and wastewater fees. The new methodology charged those who reserved water and wastewater capacity at 100% of the rate for actual usage, it being noted that, under state and federal law, 100% of those reservations were assessed against the Village's capacity, as though the reservations reflected actual usage. The methodology also included a 30%

---

[3] In July 2005, VNP also asked the state for permission to construct all of the remaining buildings in its project. In August 2005, the state issued a permit to VNP, indicating that the proposed project amended an earlier permit to construct five remaining buildings. It stated that the project was approved for a maximum of 9000 gpd of sewage.

surcharge on those deemed to be large users and those reserving large allocations, such as VNP.[4] The Village's 2006 fee structure for allocated but as yet unused water and sewer capacity was applied in a uniform and nondiscriminatory manner. It was designed, in part, to discourage residents and developers from holding unused capacity unnecessarily and unreasonably.

¶ 16. VNP eventually paid its outstanding bills in mid-2007 "under protest." The parties stipulated, and the trial court ordered, that during the pendency of this action the Village will hold 5040 gpd of allocation — the amount required for the uncompleted portion of VNP's project, as long as VNP timely pays reservation fees. As of their March 2012 stipulation, the parties were in compliance with their respective obligations.

## II.

¶ 17. Based on these and other findings, the court turned to VNP's claims. It first concluded that the Village was authorized by local water and sewer ordinances, and by state law, to charge fees for reserved water and sewer allocations. The court concluded that the power to charge reservation fees was implied in the Village's general power to manage its water system and was supported by the applicable state statute concerning wastewater systems.[5]

¶ 18. The court next addressed VNP's assertion that, assuming the fees were lawful, the Village could not revoke the reservations for nonpayment and that its threats to do so were unauthorized, unreasonable, and retaliatory. The court rejected this argument. It noted that the 1993 water and wastewater ordinances authorized the Village to revoke for nonpayment. In this case, the Village had followed the statutory procedure for disconnecting delinquent water or sewer users. See 24 V.S.A. §§ 3504, 5141-5145. VNP argued that this statutory scheme, specifically 24 V.S.A. § 5146, required that service be restored within twenty-four hours of payment of outstanding bills. It maintained that the Village could

---

[4] The trial court stated that the fees charged to VNP were based on a rate structure that resulted in unused allocated capacity being billed at a *higher* rate than that charged for actual use of allocated capacity. The Village challenges this finding as erroneous and inconsistent with the stipulated facts, cited above, which the court adopted. We agree. The parties' stipulation reflects that the 30% surcharge applies to large *actual* users and large reservations alike.

[5] On appeal, VNP does not challenge the Village's authority to charge reservation fees to "new permit holders."

not comply with this requirement if it permanently revoked and reassigned VNP's allocations because there was no excess capacity available. The court concluded that the Village was not bound by § 5146 in the circumstances of this case because only unused allocations were terminated and the purpose of the disconnection statutes was to provide a remedy where there was an interruption of existing service.

¶ 19. VNP next argued that the rates set by the Village were irrational and discriminatory because VNP was asked to pay for its reservations as if the entire amount of the allocations was actually used, and because the Village levied a 30% surcharge on VNP as a "large user." VNP argued that these rates were not reasonably related to the Village's costs and expenses. The court recognized that the Village had wide latitude in setting rates and that its rates were presumed to be reasonable.[6] After discussing relevant case law, the court concluded that the Village's rates were equitable. The court explained that the Village used a computer program that applied equally to all persons with reservations, with the only variable being the amount of the reservation. The Village claimed that it charged in full for the reservations because such reservations were counted in full against the Village's limited wastewater capacity, and it sought to discourage speculators. The court found this rationale persuasive and concluded that the rates charged by the Village were fair. The court did not directly address the 30% surcharge for large users.

¶ 20. Finally, the court turned to VNP's estoppel argument.[7] In its pretrial memorandum, VNP argued that the Village had determined in 1993 that VNP's water and sewer allocations were grandfathered and exempt from the imposition of fees, and that the Village reiterated this position to VNP in 1994. According to VNP, the Village was therefore equitably estopped from arguing that the wastewater and water allocations were not grandfathered. In a post-trial filing, VNP argued that its sewage allocation was "grandfathered" under 24 V.S.A. § 3625(e) because it "acquired" its

---

[6] Citing *Handy v. City of Rutland*, 156 Vt. 397, 403-04, 598 A.2d 114, 117-19 (1990), the Village argued that judicial review is available only with respect to the reasonableness of extraterritorial municipal rates. The court rejected the Village's argument that the court had no authority to review the reasonableness of its rates within the municipality.

[7] The trial court addressed several other arguments, including a due process claim pursuant to 42 U.S.C. § 1983, that have not been raised on appeal.

wastewater allocation from the Village before July 1, 1989. It asserted that the Village should be estopped from asserting that this statutory provision did not apply or that VNP's allocations were not grandfathered. VNP pointed to the fact that it had not been charged for its allocations for thirteen years.

¶ 21. The court concluded that although the Village told VNP in 1994 that it was grandfathered, that statement was based on an erroneous belief that the prior trustees had granted permanent allocations of water and sewer to VNP. The Village was not aware of the facts at the time it decided to "grandfather" VNP's water and sewer connections. Given this, the court concluded that VNP did not establish one of the essential elements of a claim of estoppel against a government entity. The court also found that any unfairness or perceived injustice that might result from the denial of VNP's request for an order estopping the Village from terminating VNP's rights was outweighed by the negative impact such an order would have on the Village's responsibility to fairly and reasonably manage the allocation of its available water and sewer connections among its residents. The court thus entered judgment for the Village with respect to all of VNP's claims. VNP appealed.

## III.

¶ 22. On appeal, VNP argues that, assuming the Village has the authority to charge VNP for its reserved allocation, the rate structures adopted by the Village in 2006 and in 2008 are unjust, unreasonable, and inequitable. Second, VNP argues that the Village lacks the authority to revoke VNP's wastewater or water allocations for nonpayment or for any other reason. Finally, VNP asserts that it acquired its water and wastewater allocations from the Village in 1987 and that these allocations were properly deemed grandfathered in 1993-94. According to VNP, it is exempt from subsequently adopted rates, ordinances, and special assessments imposing new fees on these allocations. Alternatively, VNP argues that the Village is estopped from now denying that VNP's reserved allocation is grandfathered. VNP also asserts that the Village is barred by the doctrine of laches from challenging the validity of its allocations.

## A.

¶ 23. We begin with the estoppel argument, as it is potentially dispositive. If the Village has granted VNP a perpetual and

cost-free reservation that is grandfathered pursuant to 24 V.S.A. § 3625(e), or if it is estopped from taking action inconsistent with this position, then the reasonableness of the Village's 2006 and 2008 rate structures is immaterial. As indicated above, the trial court rejected VNP's assertion that the Village was estopped from denying it water and sewer connections. We review de novo the court's legal conclusion as to the applicability of equitable estoppel. *In re Lyon*, 2005 VT 63, ¶ 15, 178 Vt. 232, 882 A.2d 1143; see also *Cold Brook Fire Dist. v. Adams*, 2008 VT 28, ¶ 6, 183 Vt. 614, 950 A.2d 1206 (mem.) (stating in context of estoppel analysis that Supreme Court reviews trial court's legal conclusions de novo and "will uphold such conclusions only when they are reasonably supported by the court's findings of fact"). The first question, then, is, given the stipulated and found facts, what rights, if any, did VNP acquire with respect to reserved water and wastewater allocations in 1987, 1994 or thereafter?

1.

¶ 24. The 1989 statute, 24 V.S.A. § 3625, requires that a municipality's wastewater capacity be allocated in accordance with an ordinance, bylaw, or interim bylaw. *Id.* § 3625(a). The statute further limits the extent and terms of any allocations undertaken by a municipality subsequent to the statute's effective date, but prior to the municipality's enactment of an ordinance or bylaw. *Id.* § 3625(b), (c). The statute does not apply to capacity that is "committed or allocated" before July 1, 1989. *Id.* § 3625(e). The term "committed" is defined to require formal action by a legislative body, *id.*, and the term "allocated" is undefined. The Village adopted an ordinance pursuant to this statute in 1992, and then approved VNP's requested connection in 1994, concluding that the allocation was grandfathered pursuant to the statute. We need not determine whether the wastewater capacity in question was, in fact, grandfathered pursuant to the 1989 statute because we conclude, based on the undisputed facts, that the Village is estopped from denying that VNP has reserved water and sewer rights.

¶ 25. Faced with a request to connect after adopting the ordinance, the trustees, in a duly warned 1994 public meeting, concluded that VNP's allocations of water and wastewater capacity for the condominium project were not subject to the ordinance because they were grandfathered. The meeting minutes specifi-

cally reflect that the water and sewer requirements of VNP's condominium project "are . . . grandfathered in," and note that "[t]he condominium project was allocated its water and sewer prior to the new ordinances. No action was necessary." The Village allowed connection of VNP's third building on that basis. The Village's records regarding allocations of sewer services from 1994-2001 reflect inventories of committed wastewater capacity thereafter that continued to reflect the allocation to VNP, and its conduct in connection with the 2001 hook-up of the fourth building reinforced its 1994 determination. On these stipulated and found facts, *even if* the Village is correct in arguing that VNP's allocations did not actually qualify to be grandfathered in 1993, the Village cannot come back in 2006 — well over a decade later — and disavow the documented 1994 determination of the trustees, and the Village's actions then and thereafter, by asserting that the trustees were mistaken, and denying that the water and sewer allocations were grandfathered.

¶ 26. ■ As we have explained, "[t]he doctrine of equitable estoppel precludes a party from asserting rights which otherwise may have existed as against another party who has in good faith changed his position in reliance upon earlier representations." *Lyon*, 2005 VT 63, ¶ 16 (quotation omitted). The doctrine "is based upon the grounds of public policy, fair dealing, good faith, and justice, and its purpose is to forbid one to speak against his own act, representations or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Id.* (quotations omitted). While "[e]stoppel is not a defense that should be readily available against the state, . . . neither is it a defense that should never be available." *Id.* (quotations omitted). Thus, "[w]hile the doctrine of estoppel must be applied with great caution when the government is the involved party, nevertheless when a government agent acts within [the agent's] authority, the government can be estopped by [the agent's] actions." *Id.* (quotation omitted).

¶ 27. ■ A party seeking equitable estoppel against the government must establish all of the following elements: (1) the party to be estopped must know the facts; (2) the party being estopped must intend that his conduct be acted upon; (3) the party asserting estoppel must be ignorant of the true facts; (4) the party asserting estoppel must rely on the conduct of the party to

be estopped to his detriment; and (5) the party seeking to estop the government must demonstrate that "the injustice that would ensue from a failure to find an estoppel sufficiently outweighs any effect upon public interest or policy that would result from estopping the government in a particular case." *Id.* ¶ 17 (quotations omitted).

¶ 28. ■ We first conclude, contrary to the trial court's conclusion, that based on the undisputed facts, the Village is properly charged with knowledge of the facts in this case. The Village's knowledge, particularly to the extent reflected in its meeting minutes and letters in its file, cannot depend on who happens to be at a particular meeting of trustees, and it does not dissolve with a new election. This is not a case where the Village was at the disadvantaged end of an information asymmetry. The record establishes that VNP did not have any information that the Village did not. The Village's own records are part of its knowledge, and the records put the Village on notice as to the "true facts" concerning VNP's allocations. In particular, the Village had knowledge of the 1987 letter and the extent to which the Village had treated VNP as having reserved wastewater allocations. At the same time, a simple review of prior meeting minutes would have shown that the trustees never themselves made a formal allocation of water or wastewater capacity. To the extent that the Village now argues that the trustees in 1994 mistakenly believed that they had previously, by vote of the trustees, permanently allocated wastewater and water capacity, such a mistaken belief, not induced by any representations by VNP, and inconsistent with the Village's own records, does not amount to a lack of knowledge of the facts so as to defeat VNP's estoppel claim.

¶ 29. To the extent that the Village now argues that the trustees in 1994 were mistaken in their understanding of the applicable law as to the clerk's authority to issue allocations, or the effectiveness of the wastewater allocation in the face of 24 V.S.A. § 3625, such mistake — if it was mistaken at all — likewise does not amount to a lack of knowledge that defeats an estoppel claim. The Village trustees were acting as water and sewer commissioners for the Village, and were charged with supervising the water and sewer systems. See *id.* § 3506(a) (providing that village trustees shall constitute board of sewage system commissioners unless legislative body of municipality votes to constitute a separate board of sewage system commissioners); *id.* § 3507 (stating that sewage

system commissioner shall supervise municipal sewage system and "make and establish all needed rates for rent, with rules and regulations for its control and operation").[8] In this role, the trustees are properly charged with knowledge of the law, including the terms of the 1989 statute that provided for grandfathering of wastewater allocations. See *Lyon*, 2005 VT 63, ¶ 19 (finding that because state agency's regional engineer was a duly authorized agent of government whose responsibilities included properly advising public regarding issuance of wastewater permits, he was reasonably charged with knowing laws governing his duties). The Village must bear the consequences of its misinterpretation of that statute, if any, under the circumstances here.

¶ 30. The trial court did not reach the remaining elements of estoppel (with the exception of its conclusion that no injustice would ensue from refusing to estop the Village here). Accordingly, we base our remaining analysis on the stipulated and found facts. With respect to the second element of estoppel, it is evident that the Village intended that its conduct be acted upon. When the Village informed the state that water and sewer were available for VNP's development project, VNP was able to obtain necessary state permits. In 1994, the trustees told VNP that its water and sewer applications were "grandfathered in," and that VNP had secured its water and sewer allocations prior to the effective date

---

[8] The statute providing for election or appointment of water commissioners separate from the municipal legislative board was not enacted until 1993. See 1993, No. 91, § 1.

We note that there are two chapters in Title 24 that address sewage, chapter 97 entitled "Sewage System," and chapter 101 entitled "Sewage Disposal System." Chapter 97 provides that, unless a municipality votes otherwise, the trustees of a village act as "a board of sewage system commissioners" with the power to supervise the municipal sewage system and "make and establish all needed rates for rent, with rules and regulations for its control and operation." 24 V.S.A. §§ 3506, 3507. Chapter 97 adopts certain provisions found in chapter 101, including the provision on sewer rates set forth at 24 V.S.A. § 3615. *Id.* § 3508. In a similar vein, chapter 101 provides for the creation of a "board of sewage disposal commissioners," which in this case is also the village trustees. *Id.* § 3614. This board is charged with establishing "sewer disposal charges" pursuant to § 3615. The distinction, if any, between these two chapters is not evident, and it is not clear why the law includes two separate provisions for the creation of boards, both providing for rate-setting pursuant to the same statute. In any event, we discern no meaningful difference between the boards' relevant responsibilities as described in the respective statutes.

of the 1993 ordinance. For that reason, the trustees found it unnecessary to take any action on VNP's 1994 applications.

¶ 31. The trustees reiterated to VNP in writing in 1994 that VNP's water and sewer allocations predated the effective date of the new ordinances, and that VNP therefore did not need to obtain another approval from the Village. VNP subsequently constructed and connected several buildings without paying a connection fee. The trustees here did not merely give VNP advice as to its legal status; the trustees' meeting minutes and subsequent actions reflect a determination that VNP was grandfathered. Indeed, the Village's own conduct in this case — seeking to bill VNP for the reserved and yet-unused capacity — reflected its own reliance on the 1994 determination that VNP did, in fact, have unused reserved capacity.

¶ 32. ■ As to the third element, we conclude that VNP was ignorant of the true facts. The trial court expressly found that VNP understood the 1987 letter from the Village clerk to be a commitment on the part of the Village to provide water and sewer necessary for its project and that the commitment was not time-limited. While VNP undisputedly knew that there had never been a meeting where the trustees formally approved certain levels of water and sewer allocations, it is also undisputed that it did not know that such action was required. The trustees informed VNP that it did not need to take any action under the existing ordinance because its allocations were grandfathered. Even if the trustees' conclusion reflected a misapplication of the law, we do not require VNP to know the law better than those charged with administering it. See *Lyon*, 2005 VT 63, ¶ 21 (stating that Court "will not require permit applicants to know the law better than the government agency charged with administering it," particularly where permit recipients reasonably relied on expectation that permit was issued in compliance with the law).

¶ 33. The trial court's findings reflect that VNP relied on the Village's conduct to its detriment. VNP needed allocated capacity to develop its property and it was led to believe, essentially from the commencement of its project, that the Village was holding such reserved capacity on its behalf. The parties stipulated that since 1987 VNP has invested money in the infrastructure necessary to connect its buildings, and the trial court found that VNP spent a total of approximately $250,000 for the infrastructure to

support both the built and the unbuilt buildings to which the alleged water and sewer allocations related.

¶ 34. Finally, given the scope of VNP's reservation, discussed more fully below, we conclude that "the injustice that would ensue from a failure to find an estoppel sufficiently outweighs any effect upon public interest or policy that would result from estopping the government in [this] case." *Id.* ¶ 17 (quotation omitted). Given the unusual circumstances of this case, in which the Village formally acknowledged the allocations in a meeting of the trustees, and then through its conduct reaffirmed its recognition of the allocations for more than a decade, and given VNP's reasonable reliance on the Village's representations, we conclude that the injustice in this case outweighs any countervailing public interest implicated by estopping the government. If VNP was misinformed by — and reasonably relied upon — an action of the Village trustees and subsequent actions of a duly authorized Village agent, application of estoppel does not offend public policy. See *id.* ¶ 26 (citing similar factor in considering this element of estoppel, and concluding that State should be estopped from revoking erroneously issued permit).

## 2.

¶ 35. ■ The conclusion that VNP acquired reservations of water and wastewater capacity, either by direct action of the Village or through estoppel, does not advance VNP's claim in this case that much. The critical question concerns the scope of the reservations and, in particular, whether the Village could apply any amended fee structure to VNP's reservations. Pursuant to statute, a municipality can change its sewage-disposal and water rates from time to time. See 24 V.S.A. § 3615 (sewage-disposal rates); *id.* § 3311 (water rates). There is no grandfathering provision in either statute. Neither connecting to a system, nor securing an allocation of capacity pursuant to an ordinance or bylaw, shields a developer or consumer from otherwise lawful changes in rates.

¶ 36. ■ We cannot conclude on this record that the Village is estopped from applying otherwise lawful charges, imposed on other reserved allocations, to VNP's reserved allocations. The Village clerk's 1987 letter says nothing to suggest that VNP's arguably reserved capacity is exempt from the municipality's

authority to prospectively change its rates — an authority reflected in the statutes applicable at the time. See 24 V.S.A. § 3311 (1975) (providing, as in current statute, that municipal corporation may "alter, modify, increase, or diminish" water rates from time to time, and may "extend them to any description of property or use as such municipal corporation may deem proper"); *id.* § 3615 (1975) (providing, as in current statute, that commissioners "may change the rates of such [sewer] charges from time to time as may be reasonably required"). The minutes from the 1994 trustee meeting, and the 1994 letter from the trustees to VNP, suggest, perhaps incorrectly, that the trustees opted not to apply the reservation fees provided for in the 1993 ordinance to VNP's reservations. But the record could not support the conclusion that the Village thereby exempted VNP from the ordinary peril of changing rates that faces any other reservation-holder or water or wastewater disposal consumer.

¶ 37. If the Village tried to retroactively assess reservation charges back to 1994, it would certainly be barred by the same estoppel principles outlined above from doing so. But to the extent that it has exercised its statutory authority to change rates prospectively, the trial court's findings, and the underlying record, could not support the conclusion that the Village is estopped from applying lawful, across-the-board rate changes to VNP.[9] Thus, to the extent that VNP argues that estoppel prevents the Village from asking it to pay for the reserved capacity it has claimed, that argument fails.

## B.

¶ 38. ■ We thus turn to the specific rates charged by the Village for reserved sewer and water allocations. We have never explicitly held that judicial review of intraterritorial, as opposed to extraterritorial rates, is appropriate. See *Handy*, 156 Vt. at 404, 598 A.2d at 118 (stating that Vermont law, which does not distinguish between resident and nonresident customers, requires that rates be fair, and reviewing connection rate charged to extraterritorial customer); see also *Robes v. Town of Hartford*, 161 Vt. 187, 196, 636 A.2d 342, 348 (1993) (declining to reach the

---

[9] For this same reason, we reject VNP's argument that laches bars the Village from charging VNP for reservations. The Village has not sought belated payment for reservations retroactive to 1994; it sought to charge VNP prospectively beginning in 2006 pursuant to its statutory authority to change rates.

question and noting, "the *Handy* decision was limited to a holding that 'the reasonableness of a city's *extraterritorial* sewer rates is an appropriate issue for judicial review' " (quoting *Handy*, 156 Vt. at 404, 598 A.2d at 118)). The Village suggests in light of the above that we lack the jurisdiction to review its intraterritorial rates, but it offers no principled basis in the statute, our caselaw, or policy for holding that we lack the authority to review intraterritorial rates although we have the authority to review extraterritorial rates.

¶ 39. ▓▓▓ To the extent that the statutes purport to regulate the reasonableness of water or wastewater rates, they draw no distinction between rates charged to residents and nonresidents. Thus, although we declined to reach the question in *Robes* because we did not have to, we see no reason to afford judicial review to extraterritorial users but not intraterritorial users with respect to a municipal water or wastewater system's rates. Accordingly, we reject the Village's argument that VNP's claim concerning the reasonableness of the rates is unreviewable.

1.

¶ 40. ▓▓▓ Our standard of review, however, is highly deferential. The statute regulating sewage-disposal charges identifies a host of factors on which a municipal corporation may base its rates, and provides that the municipality may use "any combination of these bases, so long as the combination is equitable." 24 V.S.A. § 3615. We have stated in the context of sewer rates that our law "requires that rates be fair, equitable and reasonable." *Handy*, 156 Vt. at 404, 598 A.2d at 118. We presume that the rates established by a lawful rate-fixing body are reasonable, and those who challenge such rates "bear the burden of showing that they are unreasonable." *Id.* VNP failed to meet its burden here.

¶ 41. As to the sewage rates, VNP argues that 24 V.S.A. § 3615 requires that rates be related to "actual costs," and maintains there is nothing to show that the Village has incurred any actual costs here. VNP states that the purchase of wastewater capacity at the Newport facility has been funded by a bond, of which VNP has paid its share, and that the Village cannot justify recovering those costs a second time by incorporating them into VNP's rates. VNP also argues that the Village is charged by the City of Newport for actual flow but it is not charged any prorated amount

for fixed operations and maintenance at the wastewater facility itself. According to VNP, it therefore follows that the Village incurs greater expense related to actual usage and wastewater flow than it does on reserved allocations and it is unfair to charge the same rate for actual use and reserved allocations. Finally, VNP posits that the 30% surcharge must be unreasonable because the Village failed to offer a rational justification to support it.[10]

¶ 42. In addressing these arguments, we note that VNP expressly does not challenge the Village's authority to charge fees for unused reserved wastewater capacity. Instead, VNP claims that charging the same rate for used and reserved wastewater capacity is necessarily "inequitable." Given the findings in this case, we disagree.

¶ 43. ▇▇▇ Section 3615 contains numerous factors that can be used to set rates for wastewater disposal, including some factors that are not use-dependent. See 24 V.S.A. § 3615 (providing that sewage commissioners "may establish annual charges separately for bond repayment, fixed operations and maintenance costs (not dependent on actual use), and variable operations and maintenance costs dependent on flow"). Metered consumption of water on the premises connected with the sewer system is one of a host of factors commissioners may consider in setting rates — some of which do not necessarily reflect or even relate to actual use. *Id.* The statute specifically authorizes the commissioners to base rates upon the appraised value of premises, in the event that they determine the sewage disposal plant to be of general benefit regardless of actual connection. *Id.* The statute allows the commissioners to use "any other equitable basis such as the number and kind of plumbing fixtures, the number of persons residing on or frequenting the premises served by those sewers, the topography, size, type of use, or impervious area of any premises." *Id.* In short, the statute gives municipalities broad discretion to consider factors other than actual use in setting municipal sewage disposal rates. See also *Robes*, 161 Vt. at 191-92, 636 A.2d at 346 (concluding under predecessor version of statute that town acted

---

[10] VNP also raises a cursory challenge to the rate structure used by the Village since 2008. It asserts that "[c]harging incremental percentages of actual flow rates depending on the amount of capacity remaining in the system is also transparently unrelated to costs." This argument is inadequately briefed, and it is also plainly insufficient to demonstrate, in the face of a presumption of reasonableness, that the new rates are inequitable.

equitably and exercised proper authority under § 3615 in imposing impact fee on new developments to finance future expansion of town's sewage capacity despite fact that fee was not based on actual use). The statutory standard the charges must meet is that they are "equitable." 24 V.S.A. § 3615.

¶ 44. Given the findings that the Village is close to its maximum wastewater capacity, and that the rate structure was applied in a uniform and nondiscriminatory manner, we conclude that the trial court's conclusion that the rates charged by the Village were fair and reasonable is supported by the record. As noted above, the Village is not tethered to a measure of "actual cost" in setting its rates for reservations or service. Moreover, the concept of "actual cost" is itself complicated. The Village's use-based payment to the City of Newport is certainly one element of cost. But the parties stipulated that the Village pays the City of Newport a prorated share on capital improvements based on unused reserved capacity. These payments are also part of the cost of reserved capacity procured by the Village, but allocated to VNP.

¶ 45. More significantly, in the not-so-long run, VNP's "use" of the capacity in the form of holding it in reserve drives the utility's costs and need for expansion just as if VNP was actually using the wastewater disposal system. VNP's reservations count against the Village's overall allocated capacity, which is limited, and the Village cannot reassign the reserved capacity as long as VNP is holding it. The Village also must be prepared to provide the reserved capacity to VNP upon demand. Finally, in a world in which demand for the Village's wastewater-disposal capacity outstrips its supply, the opportunity cost of one developer's cost-free, unused reservation would be close to the actual cost an alternate user would pay to actually *use* the capacity. Under these circumstances, and given the deference we afford to rate-setting bodies, we cannot say that charging the same rate for reservations as actual use is inequitable.

¶ 46. The 30% surcharge imposed on large users presents a closer question.[11] Our resolution of this claim, however, turns on our standard of review and the burden of proof. The burden is not

---

[11] The trial court did not separately discuss the surcharge; given its reasoning, and especially its concern about discouraging speculation, we infer that its conclusion

on the Village to justify its rates, including the 30% surcharge. It is on VNP to demonstrate, through evidence, that the rates are unreasonable. VNP presented no evidence to meet its burden; it simply asserts that this fee is "clearly unrelated to operational costs." We found similar arguments insufficient in *Robes* and in *Handy*, and we reach the same conclusion here. See *Robes*, 161 Vt. at 196, 636 A.2d at 348 (concluding as matter of law that plaintiffs failed to prove that sewage fee set by select board was unreasonable where plaintiffs alleged only that town had not conducted studies to determine necessity or cost of additional sewage capacity, but plaintiffs presented no studies of their own showing that additional capacity was not necessary or that costs were unreasonable); *Handy*, 156 Vt. at 405, 598 A.2d at 118-19 (concluding plaintiffs failed to meet burden of proving that sewer fee was unreasonable when they presented no cost analyses or other evidence showing that fee was inappropriate); see also *South Shell Inv. v. Town of Wrightsville Beach*, 703 F. Supp. 1192, 1203 (E.D.N.C. 1988) (rejecting as conclusory plaintiffs' argument that fees imposed by town must be irrational because town did not conduct cost analysis to justify them, and concluding that where plaintiffs failed to come forward with a cost analysis or other evidence concerning appropriateness of fees, they failed to demonstrate that fee was arbitrary). Without any evidence to demonstrate that the surcharge is inequitable, VNP's arguments "are conclusory only, and hence meritless." *Robes*, 161 Vt. at 196, 636 A.2d at 349.[12]

¶ 47. ▮▮▮ We note that the trial court found that the fee structure was designed, in part, to discourage residents and developers from holding unused capacity unnecessarily and unreasonably. See *Gen. Textile Printing & Processing Corp. v. City of Rocky Mount*, 908 F. Supp. 1295, 1310 (E.D.N.C. 1995) (holding that municipality could lawfully impose higher rate for high-volume sewer users to provide incentive for such users to minimize their water and sewer needs, and recognizing that "[a] governmental body certainly may endeavor to encourage desired

---

that the rates charged by the Village were fair and reasonable took into account not only the 100% reservation fee, but also the large user surcharge.

[12] On appeal, VNP merely argues, "Nor was any rational justification offered at trial for adding a 30% large user surcharge to an unconnected holder of a wastewater allocation."

behavior on the part of its citizens"); *Elmwood-Utica Houses, Inc. v. Buffalo Sewer Auth.*, 482 N.E.2d 549, 552 (N.Y. 1985) (observing that legislature had conferred virtually unfettered power upon the local sewer authority to establish sewer rents, and under these circumstances, it was clear that legislature intended that sewer authority "would fix sewer rents that, in its judgment, would best serve its economic and public policy goals, including economic differentiations among its charges so long as there is not involved any of the invidious discrimination condemned by statute or Constitution, or some utterly arbitrary discrimination not related to economic considerations or some accepted public goal" (quotation omitted)).

¶ 48. Given the impact of its shrinking capacity on the population it serves, the Village's desire to discourage hoarding of finite capacity is not an unlawful consideration. The trial court also found that the fee structure for allocated, but as yet unused, water and sewer connections was applied in a uniform and nondiscriminatory manner and was structured fairly and reasonably to manage the allocation and use of water and sewer services in the Village. This was not a rate structure that applied only to VNP, or that applied differently to VNP from any other potential users holding reserved allocations. VNP fails to show that the Village's rates for wastewater allocations are inequitable.

## 2.

¶ 49. We turn next to the water rates. VNP argues that 24 V.S.A. § 3306 allows the Village to charge only for the cost of water service based on actual usage. It asserts that the "rationale of charging 100% of the rate for actual usage again fails to account for the cost of actually delivering flow." We conclude that VNP has failed to meet its burden of showing that the actual rates imposed are arbitrary.

¶ 50. The statute regulating water rates provides as follows:

Such municipal corporation may establish rates by meter service or annual rents to be charged and paid at such times, and in such manner as such municipal corporation shall determine for the supply of water to the inhabitants of such municipal corporation and others. From time to time, it may alter, modify, increase, or diminish such rates and extend them to any description

of property or use as such municipal corporation may deem proper.

*Id.* § 3311. The statute affords a water utility broad discretion to rely on meter service or, alternatively, annual rents in setting its rates, and authorizes the utility to extend its rates "to any description of property or use as such municipal corporation may deem proper." *Id.* In short, the statute affords municipal water-works broad authority to determine what kinds of uses they will charge (such as, for example, reserved allocations), and whether they will charge based on annual fees or meter service. We will accordingly uphold municipal water rates or rents unless arbitrary or capricious. As with wastewater rates, water rates are entitled to a presumption of reasonableness, and we will defer to the municipal corporation as long as the rates are nondiscriminatory, and are not arbitrary and capricious. Cf. *Handy*, 156 Vt. at 404, 598 A.2d at 118 (wastewater rates must be "fair, equitable and reasonable").

¶ 51. Again, VNP failed to come forward with any evidence showing that the rates imposed are unreasonable. Instead, it focused on its legal argument that charges for reserved water capacity are unreasonable if they are not based on actual cost. The statute does not require the Village to base its fees on actual use or the associated marginal costs. The Village has a finite water supply, and it has deemed it proper to charge fees for water reservations to discourage speculators and to discourage individuals from holding on to such reservations unnecessarily and unreasonably. It applied its fees uniformly and in a nondiscriminatory manner.

¶ 52. VNP's legal arguments do not overcome the presumption of reasonableness in this case, and it has presented no evidence that, for example, the shortage issues that support the Village's wastewater reservation fee structure do not apply in the context of water. VNP presented no evidence and makes no argument as to the 30% surcharge on water reservations. Even if we were to consider such an argument, it fails for the same reason as the challenge to the sewer surcharge discussed above.

C.

¶ 53. Given our conclusion that the charges here are lawful, we next consider whether the Village can revoke for nonpayment.

VNP argues that there is no statute that authorizes the Village to permanently revoke reserved allocations for nonpayment. According to VNP, the Village claimed to be acting under the authority of the "disconnect" provisions of 24 V.S.A. §§ 5141-5151 but those provisions apply only to connected water and sewer services. Assuming arguendo that this statute does apply, VNP contends that it does not authorize any permanent revocation and it in fact requires resumption of service upon payment.[13]

¶ 54. We find this argument without merit. While the Village may have modeled its notice on the disconnection statutes, it did not purport to act under the authority of these statutes. A necessary corollary to the power to set rates is the power to take some action to enforce the rates. See, e.g., 24 V.S.A. § 3311 (municipal waterworks may make orders and provision concerning supply and stoppage of water necessary to enforce rates or rents). We conclude that the Village's authority to charge for unused reserved allocations impliedly includes the authority to revoke those allocations upon nonpayment. See Gade v. Chittenden Solid Waste Dist., 2009 VT 107, ¶ 13, 187 Vt. 7, 989 A.2d 491 ("The powers of a municipal corporation include both those powers granted in express words by statute and those powers necessarily or fairly implied in the powers expressly granted."). The right to condition a reservation on payment of fees necessarily implies the right to enforce the fees by revoking the reservation for nonpayment.

¶ 55. For the above reasons, we affirm the trial court's judgment for the Village and denial of VNP's various claims for declaratory and injunctive relief.

*Affirmed.*

---

[13] In its brief, VNP notes that the Village threatened to revoke its allocations because the Village considered VNP's payment "under protest" to be an anticipatory breach of the agreement by which VNP held what the Village deemed to be a provisional allocation. VNP sought injunctive relief, whereupon the Village withdrew its threat. As VNP concedes, its motion for injunctive relief consequently became moot. We consider its arguments concerning this threat to be moot as well. See *In re Moriarty*, 156 Vt. 160, 163, 588 A.2d 1063, 1064 (1991) ("A case is moot if the reviewing court can no longer grant effective relief." (quotation omitted)).