2014 VT 108

# City of Newport v. Village of Derby Center

[109 A.3d 412]

No. 13-310

Present: Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.[1]

Opinion Filed September 12, 2014

---

[1] Justice Crawford was present for conference on the briefs, but did not participate in this decision.

*Philip H. White* of *Wilson & White, PC*, Newport, for Plaintiff-Appellee.

*Christopher J. Smart* of *Cheney Saudek & Grayck PC*, Montpelier, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** This dispute arose out of a 1997 water contract requiring the Village of Derby Center[2] to supply 10,000 gallons per day (gpd) of water to the City of Newport. The City claims that the contract did not authorize the Village to adopt a new rate schedule in 2006 that included a ready-to-serve fee on top of

---

[2] The water supplier is the Derby Center Water Company, which is operated pursuant to a 1992 interlocal agreement between the Village of Derby Center and the Town of Derby, but is effectively run by the Village and its designees.

actual water usage charges. The Village counterclaims, alleging that the City connected customers who were not authorized under the contract, and that the City's water use was chronically underreported due to equipment malfunction. After a trial, the Orleans superior court ruled for the City on its contract claim, holding that the ready-to-serve fee was not authorized by either contract or statute. As to the Village's counterclaims, the court found that there was insufficient evidence to support the unauthorized-connection claim, and referred the water-usage-reconstruction claim to mediation.[3] The Village appeals on all counts. We reverse and remand for further proceedings.

¶ 2. The following facts were found by the trial court and appear to be undisputed by the parties. Other pertinent facts will be set forth in the ensuing discussion. In July 1997, the parties entered into an interlocal agreement for water. The agreement was designed to mutually benefit the Village and the City — the Village would get to sell some of its unused water capacity, and the City would be able to supply its growing industrial-park area with water at discounted rates. Under the contract, the City constructed and maintained at its own expense a 400-foot water main, which extended westward toward the City-Village property line and ended at a vault containing a master meter that would measure the water flow into the City. The contract allocated a minimum capacity of 10,000 gallons per day (gpd) to the City, and provided that the "rate charged to the City shall be ninety percent (90%) of [the Village's] rate schedule throughout the term of this agreement. . . . [The Village] reserves the right to set [the] rate schedule." The Village would have authority to set the rate schedule, but would be required to provide at least sixty days' notice of any rate increase. The agreement contained a mediation clause, and has not been amended or abrogated since it was signed.

---

[3] The trial court stated that if "there is any merit to the Village's claim of entitlement to additional payments for underreported quarterly meter statements, that dispute is hereby referred back to mediation, as required under the Agreement." In its mandate, however, the court dismissed this counterclaim as "not supported by credible evidence." The court conceded, at least in part, the merits of the Village's counterclaim when it noted the City was sometimes billed for zero usage based on "clearly erroneous" master meter readings. Therefore, despite this inconsistency we assume that the court intended to refer the counterclaim to mediation.

¶ 3. Pursuant to a June 2006 ordinance, the Village changed its rate schedule by adding a "ready-to-serve" fee for unused capacity, including a 30% surcharge for large users. After this change, the Village charged the City for the unused capacity out of its 10,000-gpd allocation, including a large-user surcharge. The Village notified the City in February 2006 of "rate increases," although its letter did not refer specifically to ready-to-serve or unused-allocation fees. The City paid these fees under protest from 2006 going forward.

¶ 4. Beyond the contract dispute itself, several other issues arose after the agreement was executed. First, for some period of time after 2006, the master meter did not accurately measure the City's water usage, although the parties dispute the exact amount owed. Second, the City connected several users outside the industrial-park area, allegedly without notice to the Village. The Village claimed that these connections contravened the agreement.

¶ 5. The parties failed to resolve their claims via mediation. After a bench trial, the court ruled that the agreement's plain terms did not authorize the Village's imposition of an unused allocation or ready-to-serve fee. Rather, the City was obligated to pay only for the water actually used. Had the Village wanted to charge the City for water not used, it would have to negotiate with the City to amend or abrogate the 1997 contract. In addition to imposing fees not authorized by the contract, the court found that the Village had breached the implied covenant of good faith and fair dealing by "abus[ing its] power to specify terms," because though the Village had the power to raise rates, it did not have the power to "modify the agreement unilaterally." The court further concluded that 24 V.S.A. § 3311, which regulates municipal corporations' setting of water rates, did not authorize the Village to charge an unused allocation fee, because the term "rate" in the statute only contemplated an unused-water fee based on actual water usage. Finally, the court concluded that the Village had not demonstrated that its unused-allocation fee was reasonable, and rejected its arguments that the fees comported with the contract's requirement that the agreement serve the best economic interests of both the City and the Village. The court granted judgment against the Village in the amount of $18,437.24, dismissed the Village's counterclaim as to the unauthorized connections, and referred the Village's counterclaim that it was entitled to additional payments due to erroneous meter readings back to mediation.

## I. City Claim

¶ 6. ■ We begin with the City's claim that the Village's ready-to-serve fee instituted in 2006 was not authorized under the 1997 water contract or by statute under 24 V.S.A. § 3311. As an initial matter, we must clarify our standard of review of the trial court's findings. "It is hornbook law that construction of contract terms is a matter of law and not a factual determination." *Ianelli v. Standish*, 156 Vt. 386, 389, 592 A.2d 901, 903 (1991) (quotation omitted). So long as a contract provision is "clear and unambiguous," then the court construes the provision as a matter of law. *Id.* (quotation marks omitted). If the court determines a contract term to be ambiguous, however, then the trier of fact determines the meaning intended by the parties. *Id.*; *Ferrill v. N. Am. Hunting Retriever Ass'n*, 173 Vt. 587, 590, 795 A.2d 1208, 1211 (2002) (mem.). The court made a series of findings that it characterized as "findings of fact" established by a "preponderance of the evidence" or by "clear and convincing evidence." These findings, however, constituted a mixture of factual findings and legal conclusions based on the court's interpretation of the contract's terms. Therefore, we review the trial court's factual findings for clear error and its legal conclusions, including its construction of unambiguous contract terms, de novo. *Bonanno v. Verizon Bus. Network Sys.*, 2014 VT 24, ¶ 13, 196 Vt. 62, 93 A.3d 146.

¶ 7. Article I of the contract provides the following relevant definitions:

(E). *Facility* shall mean the entire water system of Company . . . .

(F). *Operating costs* shall mean the totality of the costs of operation, maintenance and administration of Company's Facility, and shall include but not be limited to the costs of labor, operator training programs, costs of equipment, materials, power, fuel, chemicals, . . . and costs of maintenance.

(G). *Project costs* shall mean the total of all costs, including all construction, legal, debt service . . . and all other costs normally associated with the construction, reconstruction, modification or improvement of a water system facility . . . .

(H). *Rate schedule* shall mean the list of charges to be levied, which charges shall be designed to cover all operating costs, project costs, reserve funds and contingency funds . . . .

¶ 8. The provisions pertinent to the rates are found in Article III:

The rate charged to the City shall be ninety per cent (90%) of Company's rate schedule . . . . Company reserves right to set rate schedule and hereby agrees to notify City at least sixty (60) days prior to the effective date of any rate increase.

¶ 9. ■ The trial court construed these provisions to mean that the agreement required the City to pay only for the water it actually used. The court came to this conclusion by interpreting the term "operating costs" as "not includ[ing] any unused capacity, or unused reserved capacity, or 'ready to serve' or 'provisional allocation' fees, that is, fees to users designed to defray [the Village's] 'costs' to maintain the ability to provide water to the City and other users up to their reserved or guaranteed capacities." The court further concluded that the rate schedule in the contract did not list such fees "as a part of the rate structure." The court also found that, as a factual matter, the Village charged flat fees based on actual water usage until 2006, so the implementation of a ready-to-serve fee was a departure from past practice.[4]

¶ 10. ■ ■ "When construing a deed or other written instrument, the 'master rule' is that the intent of the parties governs." *Main St. Landing, LLC v. Lake St. Ass'n*, 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931 (mem.). In determining the intent of the

---

[4] The court's finding that the Village's past practice was only to charge for actual water usage does not appear to be supported by the record. The rate schedule prior to 2006 included a "minimum fee" charged regardless of actual water usage, including if a property was unoccupied or vacant — a fact recognized by the trial court elsewhere in its opinion. Because we rely on the plain language of the contract, however, we need not resort to past practice of the parties in discerning their intent. See *In re Rosenberg*, 2010 VT 76, ¶ 14, 188 Vt. 598, 11 A.3d 651 (mem.) ("Although we have recognized that in some instances an implied contractual provision may arise through established past practices, a construction considering such extrinsic evidence may not proceed without first finding ambiguity in the contract." (quotation omitted)).

parties, we begin with the plain language of the contract's provisions, which we interpret using the same standard as the trial court. *Ianelli*, 156 Vt. at 389, 592 A.2d at 903; see also *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 12, 188 Vt. 197, 6 A.3d 1117 (explaining that court presumes parties' intent "is reflected in the contract's language when that language is clear" (quotation omitted)). By their plain terms, all of the relevant terms in the agreement here expressly contemplate consideration of factors beyond actual water usage in setting rates. The "rate schedule" provision permits the Village to base its charges on its operating costs, project costs, reserve funds, and contingency funds. Further, the term "rate schedule" itself is defined as "the list of charges to be levied," which, contrary to the trial court's interpretation, contemplates that more than one type of charge may be levied and implies that other charges besides the water usage rates may be imposed. Even more significantly, the definition of "operating costs" — which, under the contract, may be considered in setting the rate schedule — refers to the "totality of the costs of operation, maintenance and administration of the Company's Facility." According to the provision, these costs may include a host of factors, such as labor, training and equipment, fuel, and upkeep. These articulated factors go beyond actual water usage, and the contract further makes clear with the words "shall include but not be limited to" that the list was not intended to be exhaustive.

¶ 11. Beyond the fact that these terms authorize charges beyond actual water usage, the contract specifically authorizes charges for the purposes of facility maintenance — which is precisely the purpose of the ready-to-serve fee — in the "rate schedule" and "operating costs" provisions. The trial court found, and the parties do not dispute, that the purpose of ready-to-serve fees for unused water allocation is "to maintain the ability to provide water to the City and other users up to their reserved or guaranteed capacities." Although the agreement does not literally use the terms "unused capacity," "ready to serve," or "provisional allocation," its language could not be more clear in authorizing the Village to take into account the cost of maintaining its facility in setting its rate structure.

¶ 12. By contrast, a reading that limits the basis for the rate schedule to the amount of actual water usage would contravene the plain language of the agreement. The terms "rate schedule"

and "operating costs" expressly contemplate that the Village can set rates based on other factors besides actual usage, and, as stated above, the list of factors contributing to both operating and project costs is inclusive. Moreover, the trial court's conclusion that the contract does not authorize the ready-to-serve fee to be charged to the City would conflict with the provision requiring that the City be charged 90% of the Village's rate schedule, which indisputably includes the ready-to-serve fee pursuant to the 2006 ordinance. Thus, excluding the City from these charges would ensure that the City would no longer merely be given a discount on the rates charged to other users, but that it would instead be charged based on an entirely different, and more advantageous, rate structure. In short, the plain language of the agreement authorizes the use of a ready-to-serve fee to support the Village's maintenance of its facilities. The court erred in concluding otherwise.

¶ 13. ▮▮ Nor do the circumstances surrounding the drafting of the agreement support a finding of ambiguity. Although we may consider the "circumstances surrounding the making of the agreement" in determining whether language is ambiguous, such ambiguity will be found only "where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 85 (1988). Here, the court found, based on the testimony of a Village trustee who participated in drafting the 1997 agreement, that the parties did not specifically discuss an unused allocation fee at the time the agreement was drafted, although it did establish a minimum charge to cover administrative and construction costs. This lack of specific discussion as to the exact ready-to-serve fee — particularly where a different minimum fee not based on actual water usage *was* discussed — simply does not give rise to an alternative, reasonable interpretation that this type of fee was affirmatively barred by the contract. See *Madowitz*, 2010 VT 37, ¶ 12 ("[V]aguely implied conditions [may not be inserted into an agreement], particularly when those conditions are inconsistent with the express language of the agreement." (quotation omitted)). Rather, an interpretation that barred the charges at issue here would "vary the terms of an unambiguous writing." *Kipp v. Chip's Estate*, 169 Vt. 102, 107, 732 A.2d 127, 131 (1999). For these

reasons, we conclude that there is no ambiguity in the contract's terms.

¶ 14. ■ Because we conclude that the parties' intent, as expressed in the agreement's terms, is unambiguous, we need not reach the parties' arguments regarding extrinsic evidence of the parties' intent. *Kipp*, 169 Vt. at 107, 732 A.2d at 131 ("[T]he court must accept the plain meaning of the language and not look to construction aids if the language is not ambiguous."); see also *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 8, 177 Vt. 70, 857 A.2d 263 ("Where the terms of a [contract] are plain and unambiguous, they will be given effect and enforced in accordance with their language." (quotation omitted)).

¶ 15. For similar reasons, we conclude that the trial court erred in holding that the ready-to-serve fee was not authorized by the statute that regulates municipal water rates, 24 V.S.A. § 3311. Our review of questions of statutory construction "is nondeferential and plenary." *Elkins v. Microsoft Corp.*, 174 Vt. 328, 330, 817 A.2d 9, 12 (2002).

¶ 16. 24 V.S.A. § 3311 provides:

> Such municipal corporation may establish rates by meter service or annual rents to be charged and paid at such times, and in such manner as such municipal corporation shall determine . . . . From time to time, it may alter, modify, increase, or diminish such rates and extend them to any description of property or use as such municipal corporation may deem proper.

¶ 17. ■ ■ In a companion case pertaining to a water surcharge assessed by the Village against a land developer, we interpreted § 3311 as follows:

> The statute affords a water utility broad discretion to rely on meter service or, alternatively, annual rents in setting its rates, and authorizes the utility to extend its rates "to any description of property or use as such municipal corporation may deem proper." [24 V.S.A. § 3311.] In short, the statute affords municipal water-works broad authority to determine what kinds of uses they will charge (such as, for example, reserved alloca-tions) . . . . [W]ater rates are entitled to a presumption of reasonableness, and we will defer to the municipal

corporation as long as the rates are nondiscriminatory, and are not arbitrary and capricious.

*Vt. N. Props., Inc. v. Vill. of Derby Ctr.*, 2014 VT 73, ¶ 50, 197 Vt. 130, 102 A.3d 1084. The City here has not presented any evidence that the water rates were unreasonable, instead relying on the legal argument that the unused allocation fee is not authorized because it is not part of the definition of "rate." We rejected a similar argument in *Vermont North Properties*, reasoning that "[t]he statute does not require the Village to base its fees on actual use or the associated marginal costs. The Village has a finite water supply, and it has deemed it proper to charge fees for water reservations to discourage speculators and to discourage individuals from holding on to such reservations unnecessarily and unreasonably." *Id.* ¶ 51. Contrary to the City's assertions, the statute affords the Village "broad discretion" in setting its rates, and permits the City to account for the operating costs generated by unused capacity in the rate schedule. The trial court's conclusion that the statute did not permit these fees as a matter of law was erroneous.

¶ 18. Finally, we address the City's claim that the Village did not give proper notice of the rate increase incurred through its imposition of a ready-to-serve fee. Article III of the contract between the City and the Village states that the Village "reserves [the] right to set [the] rate schedule and hereby agrees to notify City at least sixty (60) days prior to the effective date of any rate increase." In a letter dated February 22, 2006, the Village clerk notified the City that, "[i]n reference to the 'Interlocal Agreement for Water,' dated July 9, 1997, Article III, the Village is hereby giving notice to the City of Newport of rate increases." The higher rate was then charged beginning June 23, 2006.

¶ 19. ▪▪▪ The City argues that the Village's letter provided only generic notice of a rate increase, and needed to give specific notice of the ready-to-serve fee or of the actual rates to be charged. The trial court found that the City was notified of "rate increases," but not the imposition of any "fee," although the court did not appear to come to a legal conclusion as to whether the notice was sufficient. We conclude that the notice here was adequate. As stated above, under both the agreement and the relevant statute, the ready-to-serve fee is part of the rate schedule that the Village can reasonably charge. The contract gives the

Village the "right to set [the] rate schedule" and expressly allows for rate increases after the first year. Neither the contract nor the applicable statute requires specific notice of the new rates to be charged. See 24 V.S.A. § 3311 (providing that "[f]rom time to time, [the municipal corporation] may alter, modify, increase, or diminish such rates and extend them to any description of property or use as such municipal corporation may deem proper"). The Village's letter specifically referenced the agreement and clearly stated that water rates would be increased. The City does not dispute that it received this notice and took no further steps to inquire about the new rates before they were imposed. The passage of the 2006 ordinance imposing the ready-to-serve fee provided additional constructive notice of the rate changes.

¶ 20. ▮ The City argues that because the rates change on a quarterly basis, the Village by definition cannot, and has not, given notice of what the rate will be sixty days into the future. This argument is unavailing. Not only does Article III authorize precisely the billing practice of which the City complains, stating that the Village "shall bill City on a quarterly basis at the same time as other . . . users," but there is an obvious difference between the methodology for setting rates and the amounts actually owed, which may fluctuate from quarter to quarter based on variations in usage, among other factors. The City is entitled to notice of changes in the rates themselves; it is not entitled to sixty days advance notice of the exact amount of the bill each quarter. For these reasons, the notice as required by contract was sufficient.

## II. Village Counterclaims

¶ 21. Next, we address the Village's counterclaims. The Village claims that the trial court erred by (1) dismissing as not credible the Village's claim that the City connected three customers outside of the industrial-park area without notice in contravention of the contract; and (2) referring to mediation the Village's counterclaim on underreported water use by the City. We take these claims in turn.

¶ 22. As to the first claim, the Village contends that the agreement authorized connections only within the industrial-park area of the City, and that the City breached the agreement by connecting three users outside of this industrial area — a credit

union, a restaurant, and a private residence — without providing the requisite notice. These new connections were along the City main between the Village and the industrial park, and did not require an extension of the line beyond the industrial park. The only mentions of the Village's claim in the trial court's opinion are the following. First, the trial court examined the following language in Article II of the agreement: "Village shall approve all plans and specifications prior to construction. Village shall be notified prior to connection to allow Company representative to be present during connection." The court concluded that, given the surrounding context, this language referred to installation of certain pieces of equipment and not to connection of users outside of the park. Second, the court found that, although the City did not notify the Village of these three connections in advance, each of the users obtained permits, which were filed with the Village clerk. Finally, the court concluded that there was no credible evidence to support the Village's claim because the agreement did not give the Village veto power over these connections regardless of notice, and, in any event, the filing of the permits in the Village's land records provided actual and constructive notice of these connections. The court further reasoned that language in the agreement limiting its application to Phase I of the City industrial park was intended to ensure only that the agreement be revisited if the City begins Phase II of the park, not to preclude the connections here.

¶ 23. ■ In reviewing these claims, we begin with the plain language of the agreement, using the same standard as the trial court. *Ianelli*, 156 Vt. at 389, 592 A.2d at 903. Here, there are two potentially pertinent provisions of the agreement — one in Article II, entitled "Water System," and one in Article IV, entitled "Intent of the Agreement." The relevant passage of Article II states the following:

> In the event valves and monitoring stations deemed necessary are not installed or not properly maintained by either municipality, the other municipality may perform such construction or maintenance as is found necessary . . . . Village shall approve all plans and specifications prior to construction. Village shall be notified prior to connection to allow Company representative to be present during connection.

This language appears in a section of the agreement that discusses the construction and maintenance of a water main connecting the City's water system to the Village's water supply. The language pointed to by the City pertains to the installation of valves and monitoring stations on the water main to measure the amount of water being used. Read together, the paragraph appears to refer to the construction and maintenance of the extension of the water main itself. Construing the paragraph as a whole, we conclude that the language does not by its own terms apply to connection of new users, but rather to the initial construction of the distribution line and maintenance of water flow. See *Kipp*, 169 Vt. at 105, 732 A.2d at 129 (explaining that Court "read[s] the entire written instrument as a whole, giving effect to every part so as to understand the words in the context of the full [contract]" and "construe[s] the various clauses of the document, wherever possible, so that the [contract] has a consistent, or harmonious, meaning" (quotation omitted)); *In re Stacey*, 138 Vt. 68, 72, 411 A.2d 1359, 1361 (1980) (noting that "contract provisions must be viewed in their entirety and read together"). Thus, we agree with the trial court that this provision does not support the Village's claim that the contract requires notification of entirely new connections to the existing distribution line.

¶ 24. The other relevant passage, in Article IV, titled "Intent of Agreement," states that "the initial impetus for this Agreement is to provide water for Phase I of the development of an industrial district in the City . . . with the future phases to include the Town of Derby. Prior to the development of future phases, this Agreement shall be amended or abrogated." The Village argues that this language limits the connections allowed by the City solely to the industrial-park area. Further, Article II of the agreement specifically allows connection of Village users without mentioning connection of City users outside of the industrial-park area, which could give rise to an inference that the parties did not intend to authorize these City connections. On the other hand, the most natural reading of the intent provision is that it explains the general purpose — or, as stated in the provision, "the initial impetus" — of the agreement rather than imposing limiting language. Further, the reference to "future phases" of development likely means that the agreement must be modified in the event of a future extension of the line, whether into the Town of Derby or into an expansion of the industrial park, rather than referring to the connection of particular customers by the City.

¶ 25. ▮▮▮ Whether a contract provision is ambiguous is a question of law. *Isbrandtsen*, 150 Vt. at 577, 556 A.2d at 83. Ambiguity may be found in a contract provision if "reasonable people could differ as to its interpretation." *Id.* Here, the text of the agreement is subject to several equally plausible interpretations — it could be interpreted as merely stating the parties' intent to supply the industrial park with water, and to revisit the agreement upon future development, or it could be interpreted as literally limiting the supply of water to the industrial-park area. Thus, the provision is ambiguous on its face.

¶ 26. ▮▮▮ This finding of ambiguity is supported by the nature and circumstances surrounding the formation of the agreement, as reflected in the trial court's factual findings. See *Breslauer v. Fayston Sch. Dist.*, 163 Vt. 416, 425, 659 A.2d 1129, 1135 (1995) (explaining that courts may consider "the circumstances surrounding the making of the agreement as well as the object, nature and subject matter of the writing" in determining existence of ambiguity (quotation omitted)). The trial court found that the construction of the water main "in a generally westerly direction towards the City" benefitted both the Village, which would get to sell more water, and the City, which would be able to provide water service to a nascent industrial park. The court's conclusion was supported by its findings that the agreement allocates 10,000 gpd to the City with a 10% rate discount, and that the City is treated as one user no matter how many connections the City allows. Moreover, the court found that the City never used more than 25% of its allotment, and that the Village had 500,000 gdp of excess capacity at the time the contract was executed. These findings were credibly supported by the record. *Smith v. Wright*, 2013 VT 68, ¶ 22, 194 Vt. 326, 79 A.3d 876 (noting that court "will uphold factual findings on appeal if any credible evidence in the record supports them, leaving credibility determinations to the trier of fact" (quotation omitted)). Clearly, the impetus for the agreement was to supply the City's nascent industrial park. However, the Village also had excess water supply that it was presumably hoping to sell, and the City had ample opportunity to connect new users, considering that its actual water usage did not come close to its allotment. Therefore, it would likely have been economically beneficial to both the City and the Village to connect users located within the City but outside of the industrial park. On the other hand, as the trial court also found, the City receives a favorable

discount that the Village might not want to extend to ordinary users — a fact that favors the Village's interpretation that the water supply was meant to extend only to the industrial-park area.

¶ 27. ■■■ Although this Court construes the terms of the contract as a matter of law, *Bonanno*, 2014 VT 24, ¶ 13, "the proper interpretation [of an ambiguous writing] becomes a question of fact, to be determined on all relevant evidence." *Kipp*, 169 Vt. at 107, 732 A.2d at 131. Because we cannot resolve the ambiguity solely based on the findings below, we remand the Village's claim for further factual findings by the trial court as to the parties' intent on this issue.

¶ 28. Finally, we address the Village's counterclaim that the City's water use was underreported. The trial court found that after the agreement was signed, problems began with the master meter and the associated bypass-shut-off valve in the vault, resulting in occasional zero bills for the City despite its continued daily water use. There was testimony that the master meter did not accurately measure the City's water use for two or more years after 2006. The City manager called the Village many times to try to resolve the issue, including as recently as 2010. Eventually, the master meter was replaced, but the malfunctions apparently continued. In 2012, a joint test of the master meter was conducted, which showed that the automatic valve associated with the vault was allowing water to slip by unmeasured. The Village clerk testified that, as a result of these measurement discrepancies, the City owed the Village between $10,299.73 and $98,282.96.

¶ 29. From these findings, the court concluded that the evidence of actual water usage "was difficult to pin down," as each side provided different accountings of usage and the witnesses' recollections of when the master meter was or was not working were vague. The court indicated that it was clear, based on the billing periods showing a reading of zero usage by the City, that there were some erroneous readings, but it referred the Village's claims to mediation without further resolution.

¶ 30. The parties' agreement contained a clause in Article V requiring submission of any disputes — initially to a committee comprised of two Village trustees and two members of the City Council or their designees, and, if not resolved satisfactorily, to

the secretary of the Agency of Natural Resources for mediation. The parties participated in mediation on the City's contract claim before the City brought the instant suit, during which the City informed the Village, apparently for the first time, that the master meter readings had been too low to be reliable. Thus, after the City brought suit, the Village filed a motion to allow its counterclaim as to the underreported usage, which the court granted on October 3, 2011.[5]

¶ 31. ▆▆ ▆▆ We have noted that, although alternative dispute resolution is generally strongly favored, its ultimate purpose is "to provide speedy, cost-effective resolution of disputes." *LaFrance Architect v. Point Five Dev. S. Burlington, LLC*, 2013 VT 115, ¶ 23, 195 Vt. 543, 91 A.3d 364. Here, the Village was unable to submit its claim during pretrial mediation because the Village became aware of the water usage issue only during litigation. The trial court's decision to refer the Village's counterclaim to mediation in its order — *after* it had already granted the Village's motion to allow the counterclaim at trial — served only to create greater delay and expense to the parties, thus undermining the purpose of the alternative dispute resolution clause.. Even if the trial court would ordinarily have discretion over whether to send a counterclaim to mediation, under these circumstances the trial court could not properly rescind its decision, relied on by the parties, to allow the counterclaim after the trial had already taken place. Therefore, we remand the Village's counterclaim for resolution by the trial court.

*Reversed and remanded for further proceedings consistent with this opinion.*

---

[5] In November 2011 the court ordered, and the parties agreed to, a second pretrial mediation session, which was apparently delayed for a number of reasons and did not ultimately take place before trial.